OMAR OIL & GAS CO. et al. v. BAIR OIL CO. et al.

(District Court, D. Wyoming. November 25, 1922.)

No. 1251.

1. **Corporations ⬅557(5)—Evidence held not to sustain charges against officers warranting appointment of receiver.**

Evidence *held* not to sustain charges that the officers and directors of an oil company were in conspiracy with others to defraud minority stockholders or were chargeable with mismanagement which warranted appointment of a receiver.

2. **Corporations ⬅318—Transactions between corporations having same managers and directors not necessarily invalid.**

While the fact that two corporations have the same directors and managing officers subjects dealings between them to close scrutiny by the courts and casts the burden of proving their fairness on those who would sustain them, such transactions are not necessarily invalid.

3. **Evidence ⬅76—Presumption from failure of party to testify.**

The fact that defendants, charged, with their codefendants, with fraudulent conduct, did not testify, will not raise a presumption against them, where others of defendants and other witnesses having equal knowledge of the facts testified fully.

4. **Corporations ⬅180—Majority stockholders entitled to control.**

The majority stockholders of a corporation are entitled to control its affairs, and so long as they act in good faith a court is not justified in taking the management from them at the instance of the minority.

In Equity. Suit by the Omar Oil & Gas Company and N. F. Clark against the Bair Oil Company, the Kasoming Oil Company, and others. Decree for defendants.

T. J. O'Donnell, of Denver, Colo., and W. D. Stewart, of Pittsburgh, Pa., for plaintiffs.

George E. Brimmer, of Rawlins, Wyo., and N. E. Corthell, of Laramie, Wyo., for defendants.

KENNEDY, District Judge. The above-entitled cause is in the nature of a suit in equity in which the relief sought is an accounting by the defendants, other than the Bair Oil Company, of their transac-

tions in handling the affairs of that company. It is prayed that certain alleged contracts between the defendants Bair Oil Company and Kasoming Oil Company be declared null and void; that defendants other than the Bair Company be enjoined from enforcing the collection of certain promissory notes given by the Bair Company to the Kasoming Company, and a note of the plaintiffs held by the Bair Company, together with an order restraining the sale of securities for said note; that the individual defendants be removed as officers and directors of the Bair Company and others appointed in their places; that a receiver be appointed to take possession of the properties and records of the Bair Company and to operate and manage its affairs; and that the plaintiffs be awarded other proper relief in the premises, together with counsel fees.

The complaint in the cause is a voluminous document, consisting of 76 pages, to which are attached numerous exhibits.

It would be impracticable to give here a comprehensive review of the allegations of the bill, but for the purposes of this memorandum they may be summarized in a general way.

Omitting the allegations of the bill with respect to those matters giving the court jurisdiction, it is charged that the defendant Bair Oil Company has been operated by the defendants in the general purposes of a conspiracy among the individual defendants and other large oil industries described in the bill as the Standard Oil Group, to defraud plaintiffs out of their interests in the Bair Company by manipulations intended to compel plaintiffs to sell their interests at a price much below their true value; that the officers and directors of the Bair Company are identical with those of the Kasoming Company, with one exception, which is that the plaintiff Clark is an officer and director of the Bair Company; that there have been numerous business transactions between the Bair and Kasoming Companies involving contracts of various kinds, including the purchase and sale of oil products and the purchase and sale or transfer of machinery and tools from one company to the other; that these transactions are complex and involved, a portion of them illegal and fraudulent, and that it is impossible to secure a correct solution of the equities of the parties unless an accounting be ordered by the court; that there has been mismanagement on the part of the officers in control of the Bair Company to a degree that it substantially violates the rights of the plaintiffs in and to the Bair properties and to an extent which would justify the court in appointing its receiver to take charge of these properties.

The complaint is not attacked by pleading on account of any insufficiency of its allegations, but individual answers have been filed by the several defendants in which many of the allegations of the bill concerning the facts alleged are admitted and others denied, but general denials made of all the charges of conspiracy, fraud, or mismanagement.

The issues have been very thoroughly tried, involving a preliminary hearing for the appointment of a receiver, covering a period of ten days, at the conclusion of which the court denied such relief, and a final hearing covering a period of more than two weeks in the taking

of testimony. A complete review of this testimony by the court would be necessarily tiresome and perhaps useless in announcing the conclusions at which the court has arrived. The pertinent facts which may be considered as established by the evidence will be necessarily extended.

This suit involves nearly all of what is known as the Little Lost Soldier oil' field, located in Carbon county in this judicial district. Activities began in the field, so far as the issues here are involved, in about the year 1916, which led to the organization of the defendant corporation the Bair Oil Company. In this company a one-fourth interest was held by the plaintiff Clark and a three-fourths interest by one Funk and one Cochran and their associates. In the year 1917 the three-fourths interest above mentioned was acquired by defendants West and Hazlett, and was followed by a reorganization of the Bair Company and the passage of the control of that company to the new owners, which was consummated on the 18th of September, 1917. From that date up to the present time such control and management has been maintained.

The defendants West and Hazlett came to Wyoming from Independence, Kan., in pursuit of oil investments under a contract with the Prairie Oil & Gas Company, a corporation, by the terms of which contract the last-mentioned company was to furnish the capital for investment, exploitation, and operation of oil properties, including the personal expenses of the defendants West and Hazlett, and out of any such oil properties purchased, discovered, promoted, or operated and yielding an income, such expenses would be first deducted and the balance divided 60 per cent. to the Prairie Company and 40 per cent. to defendants West and Hazlett. Under this contract the interest in the Bair Company was acquired. This interest was represented by capital stock of susbtantially the three-fourths interest heretofore referred to by defendants West and Hazlett. Such stock was held by them for some time, when the Kasoming Oil Company was organized for the purpose of taking over the joint interests of the Prairie Company and defendants West and Hazlett in their oil operations in Wyoming. The stock in the Kasoming Company which was issued was distributed at that time, or subsequently, to the defendants West, Hazlett, Brimmer, and Garrettson, one share each, and to the defendant Havice as trustee the remaining shares. The stock so held by Havice as trustee represented the joint interest of the Prairie Company and West and Hazlett under the contract between them. In turn, the Kasoming Company was the holder of the three-fourths interest in the stock of the Bair Company, with the exception of single shares by the other individual defendants. It appears that under a subsequent agreement between the Prairie Company and West and Hazlett the right was given to transfer individual shares in the Kasoming Company for the purposes of organization. The organizations of the two companies were therefore maintained by boards of directors identical in personnel, with the exception that plaintiff Clark was director and one of the vice presidents of the Bair Company.

At the time the three-fourths interest was acquired by West and Hazlett in the Bair Company, the evidence discloses that there had been about seven wells drilled upon the Bair property which were in a varying state as to production, the evidence being rather conflicting upon this particular point. This field is approximately 43 miles from the Union Pacific Railroad at Ft. Steele, the nearest railway point, and when the new association commenced between the plaintiff Clark and the defendants West and Hazlett, the subject of mutual interest was that of development of the field and transportation of the product to market. This led to the conclusion by the interested parties of the building of tankage in the field for the purpose of first containing the product and, second, determining the prospective volume of the product and the capacity of the field. Matters were at first harmonious, and at this time the necessity of a pipe line to the railroad was discussed. Soon after controversies began to arise, the parties agreeing that a pipe line was a necessity to the continued operation of the field but rather disagreeing as to the time and method of constructing such pipe line. In conferences between the parties, the first plan involved the building of a pipe line by the Bair Company itself, and later at varying intervals the plan of a construction by defendants West and Hazlett themselves, and then by securing the construction by a pipe line company. In the first instance a plan was considered of issuing capital stock of the Bair Company sufficient in amount to secure the construction, the plaintiff to take one-fourth of such stock and the defendants three-fourths. Conferences were held by West and Hazlett, as well as by plaintiff Clark, with the officers of the Prairie Oil & Gas Company, looking to the construction of a pipe line. The Prairie officers did not look with favor upon the construction of the pipe line by the Bair Company, involving as it did the advancement by the Prairie Company of three-quarters of the amount necessary for the construction of the line, in which preliminary estimates showed the cost would be approximately $450,000. The Prairie Pipe Line Company afterwards became interested in the construction, made surveys, and began the construction of the line, which construction was subsequently taken over by the Illinois Pipe Line Company. The latter company actually thereafter constructed and put in operation a pipe line from the field to a railroad connection at Ft. Steele. Difficulties immediately began by reason of the fact, as shown by the evidence, that it was impossible to transport the oil during the winter or when temperatures were low. The line so constructed was a four-inch line, in which construction the defendants are at least blamed for the smallness of the pipe used and the failure to bury the line sufficiently deep so as not to be susceptible to climatic conditions. In this respect it is also claimed that the Illinois Pipe Line Company, the Prairie Oil & Gas Company, and the Prairie Pipe Line Company are all members of the so-called Standard Group, and in the furtherance of the alleged conspiracy to which the individual defendants were a party, the line was either intentionally or through gross carelessness constructed in an inadequate and improper manner. At any rate, oil was not transported through the pipe line in

the winter months. This led to increased dissatisfaction on the part of the plaintiff Clark.

The Bair Oil Company continued its development process in the field, drilling wells in various portions of the field so that the number of wells had been increased from 7 at the time West and Hazlett acquired an interest in the company, to 42 at the time of the final hearing. Some of these wells turned out to be dry holes and others water wells. It appears from the evidence that the production of the field generally speaking increased at those times when oil could be transported through the pipe line, or when the prices of oil were such that it would justify sales. The actual production I do not conceive to be sufficiently important to rehearse in detail through these varying periods. However, in the month of May, 1922, the evidence shows that 34,758.57 barrels were transported through the pipe line. At the time of the final hearing, such transportation was limited to 2,000 barrels per day, owing to the fact that other companies were also using the line; it being a common carrier. When it became apparent that the pipe line would not transport oil during the winter months, the Illinois Pipe Line Company sought a remedy for the difficulty by lowering the pipe line, but without substantial results.

Supplementing the tanks erected in the field in the first instance, additional tanks were erected at Ft. Steele with a view to the Bair Company maintaining a business the year around. The plan was to run the oil through the pipe line during the summer months, filling the tanks at Ft. Steele, and in the winter months continuing the operations of the company by filling the tanks in the field. The oil in the tanks at Ft. Steele could then be used for marketing purposes during the winter months and in the summer months the oil could be drawn from the tanks in the field, preparing them for the next winter's output. All tanks purchased from the Prairie Oil & Gas Company were second-hand tanks, but from all of the testimony appear adequate for the care of the oil. The Ft. Steele tanks were originally purchased and paid for by the Kasoming Company, but afterward turned over to the Bair Company at their cost price; the testimony showing that they were used exclusively for the storage of the Bair Company oil. Plaintiff challenged the price paid for these tanks, but no independent evidence was submitted which would lead the court to the conclusion that the price paid was exorbitant or excessive.

As soon as the difficulty in transporting oil during the winter developed, an investigation was begun looking to the quality of the oil itself as affecting its transportation through the pipe line. A chemical analysis demonstrated that the oil from the Lost Soldier field was extremely viscous, and the undisputed testimony was that the viscosity was such that at a temperature of about 50 degrees the oil would not flow. The pipe line company gradually, after experiments with heating and the like, changed the pipe line from a four-inch line to a six-inch line. The general manager for Wyoming of the Illinois Pipe Line Company testified upon the stand to the difficulties experienced with the Lost Soldier pipe line, that the oil so far as the transportation was concerned was different from any other oil in Wyoming, and that his company had

been compelled to expend hundreds of thousands of dollars in seeking to overcome this difficulty. The Illinois Pipe Line Company maintains a number of pipe lines in the Wyoming fields, some of them being of the four-inch type. In fact, the company maintains a four-inch pipe line from what is known as the Ferris field adjacent to and within a few miles of the Lost Soldier field, and has no difficulty in transporting the Ferris oil through this line throughout the year.

Water was encountered in several of the wells and difficulty was experienced in handling these particular wells. Efforts were made to plug them, but some of them from which oil is now taken still make some water. As to whether this is a severe handicap to successful operation, the evidence is in dispute. However, it appears that the condition prevailed both before and after the West and Hazlett purchase was made, as the evidence particularly shows with respect to well No. 3.

During the war the prices of materials were extremely high, and it was difficult and even impossible to secure materials and machinery to prosecute drilling operations. Casing itself was unobtainable, and secondhand casing was in demand and, where purchasable, brought high prices greatly in excess of that paid for new pipe a few months before. The same condition prevailed in regard to tankage.

In a little over a year following the close of the war the high prices then prevailing in all commodities' began to drop, and crude oil was not any exception to the general rule, so that the price of crude oil had soon dropped from $2.80 to 50 cents per barrel. The parties agree that the cost of producing the oil and transporting it to the railroad would be in the neighborhood of 90 cents. Difficulty was experienced in finding a market for the oil at all times. The evidence tends to show that the Lost Soldier oil does not possess as high a gasoline content as many other Wyoming oils.

The plaintiff Clark, naturally anxious to see the Bair Company placed upon a dividend paying basis, urged production and sale of the product for the purpose of being enabled as a stockholder to secure dividends. The defendant West, with the consent of the Prairie Oil & Gas Company, proposed the purchase of oil by the Kasoming Company at the prices then prevailing until sales could be made in the open market and that the funds thus accruing to the Bair Company be used to pay dividends to the Bair stockholders, and advised plaintiff Clark by letter of the plan. The minutes of the companies show the consummation of this agreement. The plan was evidently acceptable to Clark for the reason that it was carried out and dividends paid, so that Clark under this method received dividends of something in excess of $76,000 upon the stock held by him, an amount almost equivalent to his admitted investment in the properties. A part of the plan, as shown by the testimony and the notice to Clark, was that when the oil so purchased was finally marketed by the Kasoming Company an adjustment would be made giving the Bair Company the benefit of any additional price received over that paid by the Kasoming Company, or charging the deficit back to the Bair Company. This eventually proved to be, when the

285 F.—38

oil was sold, a deficit, and the difference was charged back to the Bair Company.

Efforts were made looking to the erection of a refinery at Ft. Steele. A large portion of the testimony in the case surrounds an incident of plaintiff Clark endeavoring to assist in securing the building of such a refinery and that he produced through one Stubbs, a witness in the case, another party by the name of Amberson, who claimed to have responsible parties in Omaha and elsewhere who might become interested in such building proposition. Amberson secured tests of the oil as to its gasoline content. After such tests had been made with varying results, Amberson accompanied the defendant West to New York, for an interview with officers of the Prairie Oil & Gas Company, evidently with a view of securing their interest and co-operation in the matter of securing the erection of a refinery. In this Amberson was paid $500 for his expenses and $1,500 for his services. It is the plaintiff's claim that this act on the part of defendant West was in the nature of a bribe to Amberson for the purpose of stopping the refinery building proposition. The defendants claim that, Amberson having secured the best results in the chemical analysis of the oil of any chemists who had made an examination, the services of Amberson in the trip to New York was the basis of the defendant Bair Company being able to dispose of from 200,000 to 300,000 barrels of oil at a price considerably in excess of any they had been able to receive up to that time. The plaintiffs base their contention as to the Amberson transaction upon a statement made by Amberson to plaintiffs, introduced in evidence, written after the visit of Amberson in the company of the defendant West to the officers of the Prairie Oil & Gas Company in New York, in which statement Amberson says that he had been advised that one Blackmer, president of the Midwest Refining Company, with a refinery located at Casper, Wyo., was to be in New York within a day or two and that Amberson drew the conclusion from this incident in his own mind that the building of a refinery had been discouraged by Blackmer and was not agreeable to the Midwest Refinery people. This conclusion was reached, as shown by the statement, from the belief of Amberson that the Midwest Company desired to secure this oil for its own refineries.

No further testimony was introduced by the plaintiff than that of Stubbs by naming one man in addition to Amberson who it was claimed was interested in the proposition, to show that any one was able, willing, and ready to build such refinery.

After the situation between the parties became more tense, the plaintiffs secured the services of an accountant to examine the books of the Bair Company, and one Murphy, an employee of a Pittsburgh auditing concern, came to the offices of the company in Cheyenne with a letter of introduction from the plaintiff Clark for the purpose of auditing the books. The testimony shows that the witness Murphy spent weeks of time in making his audit, coming back several months afterward for a second audit, upon which occasions the testimony shows every courtesy and accommodation was extended by the officers in charge of the Bair office, leaving the accountant in the office at night

with full access to all the records of the company and with no one present other than himself. In his research and examination, the testimony shows Murphy not only made examinations of the papers, books, accounts, and correspondence of the Bair Company, but also of the Kasoming Company, and in due time made his reports to plaintiffs. These audits were made use of upon the trial extensively.

The offices of the Bair Oil Company were originally maintained at Rawlins, which is the county seat of Carbon county; but after the organization of the Kasoming Company they were moved to Cheyenne and conducted by those in charge in one suite with the Kasoming Company. The books of the two companies were kept separate and distinct, with the exception that the ledgers and other general accounts were included in the same binder, together with the book accounts of other independent operations of the Kasoming Company. These were separated in the several binders by what is known as "finders," so that none of the accounts of the several companies were confused except such as might arise from the ledgers being under one binder.

The accounts of the two companies were kept distinct, including all expenses of operation, with the exception of what might be termed the overhead expenses of maintaining the offices of the two companies, in which respect the plan of one "overhead" was adopted. In carrying out this plan all salaries and other office expense were originally paid by the Kasoming Company and the Bair Company charged a fixed proportion of that expense. In the first instance such overhead was charged on a basis of 50 per cent. to each company, but later on, as the testimony shows, such expense was divided on the basis of four-fifths to the Kasoming Company and one-fifth to the Bair Company, which ratio of overhead was being maintained at the time of the commencement of this suit.

During the operations, the evidence shows that transfers of mining machinery and paraphernalia were made from the Bair Company to the Kasoming Company, and vice versa. These transactions were recorded in the nature of sales upon the books of the two companies. The defendants introduced in evidence a complete transcript of all the intercompany transactions from the time West and Hazlett purchased the interest in the Bair Company. Employees of the companies testified as to these transactions, verifying their fairness, and as to the major portion of the items included in these intercompany accounts, independent witnesses from large oil supply firms also testified as to the accuracy of the accounts, generally verifying the fairness of the prices charged. Their general conclusions were that upon the items coming under the head of oil machinery supplies the balances showed several thousand dollars in favor of the Bair Company. A warehouse was maintained by the Kasoming Oil Company at Rawlins from which supplies were purchased by the Bair Company, the prices charged the latter being cost plus 10 per cent. for freight and handling. The testimony of the defendants was that the 10 per cent. so charged was insufficient by some $25,000 to cover the actual cost to the Kasoming Company since the operation began. The testimony further shows that it was the usual custom in this and other oil fields for oil operating companies to

exchange tools and paraphernalia for drilling purposes, either by loaning the same or by selling the same one to the other.

Copious extracts from the minutes of the Bair Company were read into the evidence purporting to record generally the transactions of the company as to things which are generally conducted by boards of directors of corporations. The plaintiffs challenge these records in some respects. They assert that in some respects the minutes correctly record the transactions of the board and stockholder meetings, in other respects that they are partially correct; and in still others that they record transactions which did not happen. The plaintiff Clark is a resident of Pittsburgh, in the state of Pennsylvania, and did not attend all meetings of the board of directors. The testimony shows that from the time that West and Hazlett acquired an interest in the Bair Company up to the time of the trial, the plaintiff Clark had attended four or five meetings, and Clark's son had come for the purpose of attending another meeting, which on account of the absence of other stockholders was adjourned.

In the foregoing analysis of the evidence for the purpose of ascertaining the proven facts upon which a decision of the court must be based, it has only been possible to touch the high spots of the evidence which, with exhibits, covers considerably in excess of 2,500 pages.

The question is: What basis do these facts afford for the granting by a court of equity of the relief or any portion thereof sought by the plaintiffs?

[1] As found by the court upon the preliminary hearing for a receivership, the facts in no way justified the conclusion that a conspiracy existed between the individual defendants in combination with large oil and pipe line companies, designated by plaintiff as the Standard Group, to defraud plaintiffs out of their interests in the Bair Company or to compel them to dispose of those interests at a loss, and the specific evidence along that line has not been added to on the final hearing. The burden is upon him who alleges anything in the nature of conspiracy or fraud to prove the same by competent and convincing evidence. The interest of the Prairie Oil & Gas Company in the Bair Company is not an unusual one. It grew out of an arrangement which is practically equivalent to the early day "grubstaking" covering mining ventures in the western country, which in many instances led to the discovery of valuable property and the accumulation of great fortunes. It was a joint adventure between the Prairie Oil & Gas Company on the one side and West and Hazlett on the other. The interest of the Prairie Company in the Kasoming or Bair Companies, or the Kasoming Company in the Bair Company as a stockholder is neither unusual nor contrary to law. In fact, the statutes of our state recognize the right of a corporation to hold stock in a subsidiary company engaged in the same line of business. The Prairie Company and West and Hazlett, whether through the Kasoming Company or otherwise, were the legal and equitable holders of three-fourths interest in the Bair Company and as such had a right to the control of that company through the election of its directors and officers and to employ managers to conduct the business of the company so long as it was conducted in a

fair and honest manner with respect to the rights of other stockholders. The fact that West and Hazlett were opposed to building a pipe line, or after consideration changed their minds in regard to it, or that the Prairie Company was opposed to the proposition, is in itself no evidence of conspiracy, unless connected up with other evidence which would justify the court in reaching that conclusion. As the owner of the majority interest in the Bair Company, both or either of these interests had a right to be opposed as a matter of policy to the expenditure of large sums of money for this purpose. The same could easily be true in regard to the refinery proposition, and yet the parties concerned be acting absolutely in good faith. The difficulty experienced in the building of the pipe line by the company which subsequently did build it rather seems to justify the conclusion that it was fortunate for the Bair Company in its rather embarrassed financial condition that it did not undertake the enterprise.

The operations in the field by the Bair Company, based upon the increase in drilling operations and of production, do not seem to justify the conclusion that the management of the Bair Company had sat idly by without honest effort to develop the field and increase the production of oil. In fact, the testimony of plaintiff Clark himself seems not to justify this conclusion, in that, early in the transactions between himself and the defendants West and Hazlett, he stated that he and defendant West had talked over the purchase of his interest by them and that he had told defendant West that he would not be willing to take less than his proportionate share of the capitalization of the Bair Company, which was $2,000,000, making the price of his interest $500,000. In the next breath almost he testifies that he believes the property now worth $20,000,000 and that his interest is worth $5,000,000. Evidently the value of the property has increased, not through his management, but through the management which is evidenced by the control of the defendants since September, 1917, and which he seeks to displace.

The conditions prevailing immediately following the war affecting prices and market conditions, the difficulties experienced in pipe line transportation, the peculiar qualities of the oil produced by the company, and the peculiarities of the geological structure in these fields, have all had a varying effect upon the fortunes of the company, reacting materially against its greater success, but all of which were entirely beyond the control of the defendants. In the face of these circumstances, I think it would be an unjustifiable conclusion for this court to find that there had been mismanagement of the Bair Company.

The Amberson incident, even taking the most favorable view to the plaintiffs, from the statement of Amberson introduced in evidence, if used for a basis of finding of fact in this cause, is built upon a mere conclusion or mental operation of that individual. In fact, his conclusion is that because the Prairie Oil & Gas Company did not look with favor upon building a refinery, or rather did not approve of the building of a refinery, and that the president of the Midwest Refining Company was soon to be in New York, that these two combined conditions justified the conclusion that there was a combination of these

oil interests to defeat the refinery proposition so that the Midwest Refining Company might have the Lost Soldier oil for refinery purposes. As a matter of fact, the evidence discloses that the Midwest Refining Company, with a refinery at Casper, Wyo., is unable to take more than 30 per cent. of the output of the Salt Creek field, which is within 40 miles of its very door and connected therewith by two pipe lines.

[2] It is strenuously urged, however, that there are interlocking directorates, that the Kasoming and Bair Companies have practically the same officers, and that there were business relations under those circumstances between the two companies, as shown by the evidence, which should justify this court in ordering an accounting.

In fact, upon this point has been cited practically the only law by either counsel in the argument of this cause. The plaintiffs contend for the adoption of that rule of law laid down in the case of Corsicana Bank v. Johnson, 251 U. S. 68, at page 90, 40 Sup. Ct. 82, at page 91 (64 L. Ed. 141), in which the rule is announced as follows:

"The fact that the same persons were directors and managers of both corporations subjects their dealings inter sese to close scrutiny. That two corporations have a majority or even the whole membership of their boards of directors in common does not necessarily render transactions between them void; but transactions resulting from the agency of officers or directors acting at the same time for both must be deemed presumptively fraudulent unless expressly authorized or ratified by the stockholders; and certainly where the circumstances show, as by the undisputed evidence they tended to show in this case, that the transaction would be of great advantage to one corporation at the expense of the other, especially where in addition to this the personal interests of the directors or any of them would be enhanced at the expense of the stockholders, the transaction is voidable by the stockholders within a reasonable time after discovery of the fraud."

And in the case of Geddes v. Anaconda Mining Co., 254 U. S. 590, at page 599, 41 Sup. Ct. 209, at page 212 (65 L. Ed. 425), in which the rule is announced as follows:

"The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which it has declared, is founded in soundest morality, and we now add in the soundest business policy."

The defendants contend for the rule laid down in the case of Smith v. Stone, 21 Wyo. 62, at page 85, 128 Pac. 612, at page 617, in which that rule is announced as follows:

"The fact that two corporations are controlled by the same officers or stockholders does not prevent them from dealing with each other or the purchase by one of the property of the other, unless the acts of the majority in control are fraudulent as against the corporation and complaining stockholders. Smith v. Chase & Baker Piano Mfg. Co., supra. The courts will closely scrutinize a sale of corporate property effected by majority stockholders to another corporation, which they control or are interested in. Such a sale is not void nor constructively fraudulent. But if it is unfair to the

minority, or if any unconscionable advantage of their position has been taken by the majority, the courts will not hesitate, at the suit of the minority, to set the sale aside. Regardless of the means employed, when it appears that "the majority have put something in their pockets at the expense of the minority," a court of equity will grant relief.'"

I have been unable to find any substantial difference in any of these rules as to the substantive facts to be proven, but take it that the differentiation, if any, must be confined to what may be considered as the burden of proof.

I am not in accord with the contention of counsel for defendants that the Wyoming rule, as announced by the Supreme Court of this state, should govern this court in equity causes, but assume that it should be governed by the rule of the highest federal court, and that it is incumbent under the circumstances such as appear in this cause, for the defendants to prove the fairness and honesty of their transactions while acting as officers and directors of the two companies. So far as the accounting departments of these two companies are concerned, I see nothing to justify the conclusion that the accounts or properties were in any wise confused. The books were kept separately and accurately so far as recording purported transactions is concerned, and witness Murphy, as accountant for the plaintiff, approved the methods of bookkeeping and stated that the accounts were clear and recorded in such a manner as to be intelligible to any competent accountant. The inclusion of company ledger accounts in one binder is an incident of no consequence if the accounts themselves were distinct. The defendants, with considerable care and at what must have been considerable expense, presented and introduced in evidence a complete transcript from the books of the several companies, showing the intercompany transactions, and sustained their verity, correctness, and fairness by not only officers and employees of the company, but in a large degree by the testimony of independent witnesses whose conclusions were that upon the whole of these transactions the Bair Company had been the beneficiary rather than the sufferer.

The transaction of the purchase of oil by the Kasoming Company from the Bair Company and the subsequent readjustment of the price when the oil was actually sold by the Kasoming Company would in its very nature be a transaction deserving the closest scrutiny by a court of equity. No challenge, however, is made by the plaintiff in this transaction that the prices at which the oil was eventually sold were unfair or unreasonable, and this, coupled with the fact that the evidence clearly shows that the transaction was for the purpose of accommodating the plaintiff Clark's inordinate demand for dividends and that he was familiar with the proposed transaction before it was carried into effect, certainly could not justify the court in granting the relief he has prayed for on account of any irregularity when he himself was a party to it.

Following the rule laid down by the Supreme Court, I believe that the defendants have assumed the burden of proof and have shown the intercompany transactions to have been conducted with fairness and honesty to the Bair Company, and any irregularity, such as the sale

of oil by one to the other, was done for the accomodation of the plaintiff, with his knowledge and for his benefit, and by it he is bound.

So far as an accounting is concerned, the plaintiffs, months in advance of the trial by their access to the records of the company and their services of an expert accountant, had a complete accounting from the books of the company, and had they desired to challenge any of these transactions as to unfairness, they had ample opportunity to do so upon the trial by evidence in chief and a second opportunity to do so after the defendants had presented their case in court showing these transactions.

So far as the actions of the plaintiff Clark and his knowledge of the operations of the company are concerned, they are binding upon the plaintiff Omar Oil Company for two reasons. In the first place, Clark is the president of the Omar Oil Company and as such represented that company in the counsels of the Bair Company. Again, the books of the Bair Company show that the stock stands in the name of the plaintiff Clark and has never been transferred on the books of the Bair Company to the Omar Company, although Clark testified that the Omar Company was the owner.

[3] Counsel for the plaintiffs in his final argument severely arraigned the defense upon the ground that the defendants Hazlett, Havice, and Garrettson did not testify. His contention is that applying the rule that the facts in this cause were such as to compel defendants to make a full discovery and explanation of all their transactions, the circumstances of these defendants not testifying should be resolved against them and their codefendants. Among other cases cited as sustaining this contention is Choctaw & M. R. Co. v. Newton, 140 Fed. 225, at page 238, 71 C. C. A. 655, at page 668, where the rule is announced as follows:

"Where a party has the means of producing testimony within his knowledge or keeping upon a material question involved in the case, and fails to do so, the presumption arises that the fact is against him."

Another case cited is Gulf, C. & S. F. Ry. Co. v. Ellis, 54 Fed. 481, 4 C. C. A. 454. Both of these cases are from our own Eighth circuit.

The rule announced in these cases may be and is adopted by this court in the disposition of this cause, and yet it does not seem to justify any presumption against the defendants and for the reason that there was no material fact in issue proven to be within the peculiar knowledge of these particular defendants which was not fully disclosed by the books and accounts of the companies introduced in evidence and the testimony of other witnesses called by the defense. The rule cannot be said to extend so far as to include all parties in whose knowledge the material facts rest, provided those facts are disclosed by witnesses on the same side in whose knowledge the material facts equally rest.

Neither can there be a just complaint that certain of the opposing parties are not called as witnesses whom opposing counsel should prefer to cross-examine rather than those who are called, where the material facts themselves are testified to and disclosed by colitigants or other witnesses having equal knowledge. The rule is simply to protect

against a litigant having at his command witnesses with sole knowledge of material facts the basis of an issue in a cause, refusing to give the court the benefit of that testimony.

The only incident appearing upon the whole trial evidencing an intention to conceal any transactions of the Bair Company from the plaintiff Clark appears in the form of a letter written by the defendant Havice to the defendant West, in which he stated that in a letter written to the defendant Clark he (Havice) did not tell Clark about the coming in of a well being drilled, and which in explanation defendant West testified that he had criticised Havice and that Havice had made an explanation by stating that the information in regard to the well had been received after his letter to Clark had been written. Construing it, however, strictly against the defendants, it is scarcely to be held to be sufficient to justify a conclusion of concealment or unfair dealing covering the entire transactions of the company, considering the fact that Clark was repeatedly invited to attend meetings and did not; must have known that the by-laws provided for regular directors' meetings and did not attend, and that the entire run of the office was turned over to his employee for examination, including all books, accounts, and correspondence of both companies.

The notes of which plaintiffs seek to restrain collection against the Bair Company represent money borrowed by the Bair Company to conduct its operations, and except for the transaction itself as it shows upon its face that one company is borrowing from another, no evidence appears that the loan was unfair or unnecessary for the legitimate purposes of the Bair Company.

[4] A quarrel among stockholders, it has been repeatedly held, does not justify a court in interceding in company affairs or taking the management out of the control of the majority. It is their right to declare and promulgate the policies of the company, and unless the operations show that the company has been conducted in a manner unfair or dishonest to the minority, courts of equity will not interfere. Brictson v. Close (C. C. A.) 280 Fed. 297.

Doubtless the operations of the company, so far as yielding returns is concerned, were as disappointing to the majority interests as to the minority; but this is the common misfortune of a great multitude of those interested in the oil business.

Reserved rulings on the introduction of testimony are disposed of by objections now being overruled.

For the reasons stated, the prayer of the complaint will be denied and findings and conclusions embraced in a decree in accordance with this memorandum in favor of defendants, with costs to be taxed as against the plaintiffs.