**IRVING BANK–COLUMBIA TRUST CO. v. STODDARD et al.**

(Circuit Court of Appeals, First Circuit. September 29, 1923. On Rehearing, November 10, 1923.)

No. 1650.

1. Corporations ⊕=318—Agreements and assignments by officers common to corporations, parties to transaction, voidable, if unfair.

Agreements and assignments entered into by directors of a corporation, who were also officers or representatives of banks dealing with the corporation, are voidable by the corporation, unless made in good faith, without fraud, and are not unfair or oppressive to the corporation.

2. Corporations ⊕=318—Burden of proof to show transaction between common directors of corporation and banks fair, and not oppressive.

Where agreements are entered into between common directors of a corporation and banks of which such directors are officers or representatives, the burden of showing the agreements to be fair and absolutely free from fraud rests on him who seeks to uphold the transaction.

⊕=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Corporations ⟨⟩318—Rate of interest in contract between bank and corporation not oppressive.**

Seven per cent. interest on loans by banks to corporation *held* not oppressive, so as to render void assignments made to the bank as security, because the directors of the corporation were also officers or representatives of the banks.

**4. Corporations ⟨⟩318—Evidence held to show transaction between bank and corporation fair.**

Evidence *held* to show that agreements and assignments between banks and a corporation were not unfair, so as to render them voidable, in that directors of the corporation were also officers or representatives of the banks.

**5. Appeal and error ⟨⟩1009(3)—Deference paid to decision of equity court.**

Though an equity court, taking charge of a receivership, should have great deference paid to its decision on a question of disputed facts, where the court has the opportunity to see the parties interested and their witnesses, the appellate court may freely decide the case differently, and reverse where there is no controversy on facts.

**6. Corporations ⟨⟩318—Fairness of transaction between directors common to both sides, viewed in light of facts existing at the time.**

In determining whether a transaction between directors of a corporation and banks, of which such directors are common officers, is fair, and not oppressive, it must be viewed in the light of the facts existing at the time of the transaction, and such transactions cannot be avoided because of errors of such directors in later mismanaging the business.

Appeal from the District Court of the United States for the District of Massachusetts; George W. Anderson, Judge.

Bill in equity by Charles R. Scarborough against the New Home Sewing Machine Company for appointment of a receiver, in which Charles W. Stoddard was appointed receiver. From a decree dismissing its petition as intervener, the Irving Bank-Columbia Trust Company appeals. Reversed and remanded.

Thomas Hunt, of Boston, Mass. (Gaston, Snow, Saltonstall & Hunt, of Boston, Mass., and Merrill, Rogers, Gifford & Woody, of New York City, on the brief), for appellant.

Lyman K. Clark, of Boston, Mass., for appellee Stoddard.

Joseph B. Ely, of Springfield, Mass., for appellee Scarborough.

William M. Evarts, of New York City (Murray, Prentice & Aldrich, of New York City, and J. Butler Studley and Dunbar, Nutter & McClennen, all of Boston, Mass., on the brief), for appellees American Trust Co. and others.

R. L. Dana, of Boston, Mass. (S. H. Pillsbury and Pillsbury, Dana & Young, all of Boston, Mass., on the brief), for intervener merchandise creditors committee.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge. The case is now before the court upon appeal from a decree of the District Court for Massachusetts, dismissing the petition of the Irving Bank-Columbia Trust Company, which seeks to intervene in the equity proceedings, and to recover from the receiver the possession of certain moneys, which it says are the prop-

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

erty of the petitioner, in trust for the holders or owners of notes issued under certain agreements between the New Home Sewing Machine Corporation and the Columbia Trust Company; the money now held by the receiver being the proceeds of the defendant's bills receivable, collected by him under a certain stipulation.

The answer sets up that the agreements were executed by officers of the defendant corporation, controlled by the representatives of the banks, beneficiaries of the alleged trust; that the agreements are therefore voidable; and that they must be avoided because they are unfair, unjust and oppressive in character.

The answer prays that the title to the receivables referred to in the petition be determined and declared, by decree of the court; that any excess of receivables, over and above any amounts found applicable to the petitioner's demand, be declared released, and made applicable to the current operating expenses of the respondent; and that the receiver be fully instructed as to his duties in the premises.

The record shows that, prior to 1920, the New Home Sewing Machine Company carried on a business in manufacturing and selling sewing machines and needles in Orange, Mass., and had a plant worth nearly $1,000,000; that many of its sales were made upon credit, and upon the installment plan; and that its receivables consisted of promissory notes of small amounts, leases of sewing machines, agreements of conditional sale, and book accounts.

In 1920 or 1921 it appears to have suffered either from misfortune or mismanagement, or both, with the result that it incurred indebtedness of about $900,000 to 11 banks. In August of 1921 it found itself unable to pay this indebtedness, and needed an extension. The banks were unwilling to extend their loans, unless they were given the management and control of the business, as the company was already largely indebted to them. Thereupon the banks demanded and received full control of the company. By means of resignation and election, three of the five directors were named by the bank creditors. A voting trust was constituted, under which the bank representatives obtained control of about 95 per cent. of both common and preferred stock. After this the banks controlled the policy and administration of the corporation. They made D. Forrest Candee chief executive and treasurer. The voting trustees were Carleton Bunce, W. G. Kimball, and G. Foster Smith. Bunce is a vice president of the Equitable Trust Company; Kimball is vice president of the Irving Bank-Columbia Trust Company; Smith is president of the Nassau National Bank. The three directors, who also constituted the executive committee, were Candee, Bunce, and Kimball. The voting trustees, controlling nearly 95 per cent. of the stock, the executive committee, the majority of the board of directors, and the bank creditors committee, were, from the autumn of 1921 until after the appointment of the receiver, substantially the same persons.

In April, 1922, the company was in financial stress, and needed more money. The situation was stated to the banks, and they consented to provide $150,000 by discounting the demand notes of the corporation, payable to the trust company as trustee for all the lend-

ing banks, and secured by assignments of the company's "receivables" to the trust company as trustee for the banks. These receivables consisted of notes, leases of sewing machines, and book accounts. From the record we are satisfied that the agreement for the loan, the written assignment, which was a part of the agreement, and the notes of the company given for the money loaned, were in due form, and duly authorized and executed. From month to month supplementary written assignments were delivered to the trustee covering the notes, accounts, and leases constituting the accruing accounts receivable.

In October, 1922, the company was in great stress. The situation was brought to the attention of the banks, and they provided an additional sum of $100,000, secured as the former loan of $150,000 had been secured. In January, 1923, the same situation was again presented and was met in the same manner. The amount of the loans was then increased by another $100,000, of which $15,000 was actually advanced. We are satisfied by the evidence in the record that the instruments by which the additional sums were secured in October, 1922, and in January, 1923, were duly authorized and executed. The rate of interest was fixed at 7 per cent. by the terms of the loan agreement; but, in September, 1922, it was reduced to 6 per cent., and it appears that interest on the loan has been paid up to March 31, 1923. The proportion by which the security exceeded the amount of the loan was also reduced.

The present bill in equity, framed for the appointment of a receiver of the defendant company, was filed April 10, 1923, by the plaintiff, Charles R. Scarborough, the holder of a majority of the stock of the company, and its president and general manager. The creditor banks and the corporation itself consented to the appointment. The trust company, as the trustee, made a written demand, on April 12, 1923, upon the company for the delivery to it of all moneys, contracts, leases, notes, and other evidences representing the assigned receivables, and on April 14 the defendant company complied with the demand. The decree appointing the receiver was entered April 17, 1923. A stipulation was filed April 27, 1923, and approved by the court, under the terms of which the trust company delivered to the receiver the ledgers, accounts, records, memoranda, and leases which constituted the evidences of accounts receivable, assigned, with a view to the receiver's collecting the accounts for the benefit of whom it might concern, and without prejudice to any existing rights in the proceeds; his collections to be deposited in certain banks in Boston subject to the order of the District Court.

In May, 1923, the trust company filed the petition which is now before the court, setting forth substantially the above facts, and praying for a decree adjudicating the moneys collected by the receiver, under the terms of the stipulation, to be its property, and held by it in trust for the banks participating in the loan, and directing the receiver to pay over to the petitioner, in trust for the banks, the amount which he had collected on account of the assigned receivables.

[1] The loan agreements and assignments, followed, as they were, by actual taking possession by the trust company of all the tangible

evidences of the receivables, purport, upon their face, to constitute a complete transfer of all rights in those receivables, and to give the trust company a "legal and equitable title" to same, in trust for the other note holders; they were drawn for the purpose of giving such title; in our opinion they do give such title, unless the defenses raised by the answer shall prevail. But it is clear that the loan agreements and assignments to which we have referred were made by the directors of the defendant company while they were also officers or representatives of the banks loaning the money. These agreements and assignments are therefore voidable by the company unless it shall be found— the burden being upon the petitioner—that those agreements were made in good faith, without fraud, and were not unfair or oppressive to the company. A clear, sharp issue of fact is presented by the petition and answer.

The law is fully stated in Geddes v. Anaconda Copper Mining Co., 254 U. S. 590, 599, 41 Sup. Ct. 209, 212 (65 L. Ed. 425):

"The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 588; Thomas v. Brownville, Ft. Kearney & Pacific R. R. Co., 109 U. S. 522; Wardell v. Railroad Co., 103 U. S. 651, 658; Corsicana National Bank v. Johnson, 251 U. S. 68, 90."

See, also, Omar Oil & Gas Co. v. Bair Oil Co. (D. C.) 285 Fed. 588, 598.

[2] The rule appears to be that the presence of directors on both sides of a transaction does not give an arbitrary right to avoid the transaction, but subjects it to the closest scrutiny of the court; it casts upon those who seek to uphold the transaction the burden of showing that it is fair and absolutely free from fraud. An interlocking directorate is not conclusively presumed to have done wrong in every transaction. Leavenworth County Commissioners v. Chicago Rock Island & Pacific Railway Co., 134 U. S. 688, 707, 10 Sup. Ct. 708, 33 L. Ed. 1064; 2 Thompson on Corporations, §§ 1242, 1243.

The question of fact, raised by the pleadings, is brought sharply before the court: Does the case show a transaction, fair and absolutely free from fraud? Upon this issue the burden is upon the trust company, and the duty is cast upon this court to subject the matter to the closest scrutiny. There is not much question about the facts themselves.

During 1920 and the early part of 1921 the New Home Sewing Machine Company became indebted to the banks to the amount of about $900,000. In August, 1921, it was unable to meet its obligations as they matured. It required of the banks an extension of time. The banks did not have confidence in the corporate management. They were willing to grant an extension, however, if the future control and

administration of the company should be given to their representatives. The stockholders acceded to this, in August, 1921. Time for payment of the notes was extended by agreement, Candee was made the new president and treasurer, and he, with two other representatives of the bank, became executives and managers of the board of directors. The control of the banks became effective at once, and, since that time, the banks controlled the policies of the corporation.

After the banks had control of the situation, financial success still failed to come; and in April, 1922, the company was in need of ready money. Candee testifies: "It was life or death to get it." The assets of the company, available as security for the loan, consisted of its manufacturing plant and its accounts receivable.

[3] It is now urged by learned counsel for the defense that it was the duty of the banks, at this crisis, to procure money from some savings bank or other financial institution upon a mortgage of the manufacturing plant; but it is. clear that the loan was not of a character to attract investors. We find nothing in the record tending to show that the money needed could have been borrowed upon more advantageous terms than the banks offered, or that it could have been procured at all from any other financial institution. It was difficult to negotiate such a loan with investors not interested in the company. It is evident that the banks were not hopeful that any other bank would be induced to take a real estate mortgage on the plant of an unsuccessful manufacturing company, while the banks in close touch with the company were not willing to advance money for its use. But these banks had a substantial interest in saving the plant and their security from a common ruin, for the company was already indebted to them in a very large sum. The banks, then, determined to seek their security from the receivables, consisting of notes, leases, and book accounts resulting from sales on credit and sales on the installment plan. The face value of these receivables was estimated at $515,000. The claims, constituting the receivables, were for small amounts; the debtors were scattered all over the country; the security was slow and unmarketable, and, of course, some substantial part of it must prove of little value. Under such circumstances, the rate agreed upon was not oppressive; and this rate was later reduced to 6 per cent. in order that the company might more easily meet its obligations and preserve the security. The required ratio of collateral security was also further reduced, finally to 175 per cent. The company was not deprived of the use of the proceeds of the claims as working capital, but was permitted to keep and use all collections in its business on substituting other receivables until the receivership was determined upon.

[4] The whole testimony relating to the transaction leads us to find affirmatively that there was nothing unfair, fraudulent, or oppressive in making the first agreement of April, 1922. It further persuades us that the transactions with reference to the last two agreements were free from fraud, and were not unfair to the sewing machine company. It appears that the stockholders of the company had opportunity to make suggestions of any impropriety in the agreements, for meetings were held afterwards at which nearly all the stock was represented; the stockholders had a right to appear and make protest if they found

it to their advantage to do so. It is impossible to believe that the creditor banks desired to bring failure to the business of the corporation, as well as to their own security.

[5] We cannot sustain the action of the District Court in holding the three agreements to be unfair and oppressive to the sewing machine company. It is true that an equity court, taking charge of a receivership, should have great deference paid to its decision on a question of disputed facts, where the court has the opportunity to see the parties interested and their witnesses; but here there is no controversy on facts, and an appellate court is able to come to a sound conclusion as competently as the District Court.

[6] The learned judge who heard the case in the District Court has laid great stress upon errors of the bank directors in mismanaging the business since the execution of the agreements; but it is clear that the transaction must be viewed in the light of facts existing at the time of the execution of the agreements. If the bank directors acted in good faith in executing the agreements, they are not to be punished because, later, they committed errors in the management of the company's affairs. Such errors may be dealt with on proceedings brought for that purpose, in which all persons and corporations having a legal or equitable interest shall be made parties. The case now before us is presented on a clear, sharp issue raised by the petition and answer, as we have already stated; and we cannot wander from that issue into a discussion relating to mismanagement in the conduct of the company's affairs after the execution of the agreements, or errors in marshaling the assets.

It appears, however, to be substantially admitted on all sides that the sum of $77,045.06 has been collected by the banks from the receivables, deposited in the banks, and erroneously applied to the payment of their unsecured debt. It is clear, however, that their secured debt has been, in fact, reduced by that amount. It seems, therefore, that this sum should be applied to the reduction of the debt secured by the receivables. This reduces their claim from $265,000 to $187,954.94.

The record convinces us that the board of directors acted in good faith, and with reasonable judgment and knowledge of affairs, in making the agreements in question. We think they borrowed upon reasonable terms such money as was absolutely necessary to preserve the financial existence of the company, and that they used as security for the loan the only assets held by the company which were promptly available for the purpose. We think they acted in good faith and with reasonable regard for the rights of the borrowing company.

The petitioner, then, is entitled to a decree that the amounts collected by the receiver from the debtors owing accounts receivable, as defined in Exhibits A, B, and C, annexed to the petition, are the property of the petitioner, in trust for the holders or owners of notes referred to and issued under agreements between the New Home Sewing Machine Company and Columbia Trust Company, dated April 18, 1922, October 19, 1922, and January 15, 1923.

The receiver is directed to pay over to the petitioner, in trust for the holders or owners of such notes, all such amounts as he has heretofore collected and shall hereafter collect from debtors owing such accounts receivable, up to the sum of $187,954.94, with interest since March 31, 1923.

The decree of the District Court is reversed, the case is remanded to that court for further proceedings not inconsistent with this opinion, and the appellant recovers its costs of appeal.

## On Rehearing.

PER CURIAM. A rehearing having been had, we reaffirm our decree that the receiver be directed to pay over to the petitioner, in trust for the holders or owners of the notes in question, all such amounts as he has heretofore collected, and shall hereafter collect, from debtors owing accounts receivable, up to the sum of $187,954.94, with interest since March 31, 1923. But as the rehearing disclosed that the record with reference to the item of $77,045.06 is incomplete and unsatisfactory we are constrained to leave to the District Court the duty to take such further action as it shall find equitable upon this item, also upon the Theodore Kuntz Company note, and upon the expenses, charges, and disbursements of the trustee, as to some or all of which the petitioner seeks to assert liens on the receivables.

The result is that the cash derived from the receivables in excess of $187,954.94 must be held to await the determination of such claims.

Our former decree of September 29, 1923, except as above modified, is hereby affirmed.

The decree of the District Court is reversed, the case is remanded to that court for further proceedings not inconsistent with the opinion of September 29, 1923, as modified by this opinion, and the appellant recovers its costs of appeal.