KELLOGG et al. v. CLYNE, Intervener.

(Circuit Court of Appeals, Eighth Circuit. February 20, 1893.)

No. 158.

1. FRAUDULENT CONVEYANCES—WHAT CONSTITUTES.

A mortgage executed by a debtor in failing circumstances, for a sum known to be in excess of what is actually due, and known by the creditor at the time he takes it to be in excess of what is due him, is presumptively fraudulent.

2. SAME—EVIDENCE—ADMISSIBILITY.

Where the issue is whether A. gave a chattel mortgage to B. in good faith, or with the intention of defrauding creditors, it is competent to show that A., at about the same time, conveyed other property to C., and that C. conveyed such property to B., and it is also competent to prove what C. said and did with reference to the conveyance to him of such property.

3. FRAUDULENT CONVEYANCES—INSTRUCTIONS—EXPRESSION OF OPINION.

On a question as to whether a chattel mortgage between brothers is fraudulent as to creditors, there being evidence tending to show fraud, the following instruction is not merely the expression of opinion such as federal judges are authorized to give, but amounts to a peremptory instruction to return a verdict, and is erroneous, to wit: "A great deal has been said about brothers, and the conspiracy between them. I do not know of any testimony that tends to show any conspiracy between the brothers for the purpose of defrauding creditors, so far as I am able to see; and I think I ought to say to the jury that under no circumstances does the testimony justify the inference that there was a conspiracy entered into between the brothers for the purpose of defrauding these creditors of John Clyne."

4. TRIAL—INSTRUCTIONS—HYPOTHETICAL CASE.

An instruction by the court to the jury ought not to be predicated upon a purely hypothetical state of facts, for which neither party contends, as it tends to divert the attention of the jury from the issues which are really in controversy.

In Error to the Circuit Court of the United States for the District of Nebraska.

Action by William H. Kellogg and others, composing the firm of Charles P. Kellogg & Co., against John Clyne, for goods sold and delivered. An attachment was issued in the action, and levied upon property which Louis C. Clyne claimed to own by virtue of a chattel mortgage to him from John Clyne. Louis C. Clyne intervened, claiming the property, and judgment was entered in his favor. Plaintiffs bring error. Reversed.

Statement by THAYER, District Judge:

This was an intervention by Louis C. Clyne in an attachment suit brought by Charles P. Kellogg & Co. against his brother John Clyne, whereby the intervener sought to recover from the firm of Charles P. Kellogg & Co. the proceeds of certain merchandise which that firm had caused to be attached and sold as the property of John Clyne. The intervener based his claim to the

proceeds of the goods upon a mortgage in his favor which had been executed by John Clyne on January 3, 1891, some three weeks prior to the commencement of the attachment suit. The firm of Charles P. Kellogg & Co. alleged that the mortgage under which the intervener claimed was contrived by and between John and Louis C. Clyne for the purpose of hindering and delaying the creditors of the former in the collection of their just debts. There was a trial of this issue before a jury, which resulted in a verdict in favor of the intervener, and against the attaching creditors, in the sum of $3,265.50. To establish the charge of fraud, Charles P. Kellogg & Co. offered testimony which established, or tended to establish, the following facts:

For about three years prior to January 3, 1891, John Clyne resided at Friend, Neb., and was engaged in business at that place as a merchant. Prior thereto he had resided for three or four years at Stafford, Kan., and had acquired considerable real property in and about Stafford. Before taking up his abode in Kansas, Clyne had resided for several years at Maple Park, Ill., and had also been engaged in business at that place as a merchant. While thus engaged in business in Maple Park, Louis C. Clyne was in the service of his brother John as a clerk, from 1879 until April 15, 1884. On the last-mentioned date, John and Louis C. Clyne became partners in the mercantile business at Maple Park under the name of L. C. Clyne & Co., and immediately thereafter John removed to Kansas, leaving Louis in full charge of the business at Maple Park. The total capital invested in that firm amounted to $3,000, of which sum Louis contributed $1,500, being the amount that John was then indebted to him for services theretofore rendered. The firm of L. C. Clyne & Co. continued in existence until January, 1888, when John withdrew, and the business was thereafter conducted by Louis on his own account. The net profits of the business transacted by L. C. Clyne & Co. for the whole period from April, 1884, to January, 1888, amounted to $12,527. The business at Maple Park was transacted in a building hereafter termed the "Maple Park Property," the title whereof stood in the name of John Clyne, so far as the record showed, from 1876, when he acquired it, until February 22, 1889. For the use of such building and premises the firm of L. C. Clyne & Co., during its existence, and subsequently Louis C. Clyne, paid rent to John Clyne until January 7, 1890, at the rate of $240 per year. On the 22d of February, 1889, a deed was placed on record, bearing date September 1, 1876, whereby John Clyne conveyed the Maple Park property to Joseph Clyne, another brother of John, who resided at Stafford, Kan., for an expressed consideration of $3,000. There was considerable testimony offered which tended to show, and from which a jury might infer, that the conveyance to Joseph Clyne of the Maple Park property was made with a view of preventing the collection of a note which had been signed by John Clyne, and on which suit was brought against him by attachment, by a certain bank, on the 7th of February, 1889, in Kane county, Ill. On the 22d of September, 1890, Joseph Clyne conveyed the Maple Park property to Louis C. Clyne, by a quitclaim deed, for the expressed consideration of $3,000. Joseph and Louis Clyne were both called as witnesses. Louis did not venture to give any explanation of the purchase of the Maple Park property in September, 1890, but Joseph claimed that it was a bona fide sale, for which he had received notes made by Louis to the amount of $3,000.

The testimony further tended to show that John Clyne was largely indebted in the fall of 1890; that in November of that year he conveyed all of his real estate situated in and about Stafford, Kan., to Ed. H. Landes, without any consideration moving from said Landes, and that on January 12, 1891, Landes conveyed the same property to Joseph Clyne for an expressed consideration of $3,600 but without any actual consideration, and that Landes was a mere conduit through whom the title to that property was conveyed by John to his brother Joseph. On the 3d of January, 1891, John Clyne executed two mortgages on his stock in trade situated at Friend, Neb.,—one in favor of a bank located at that place, for the sum of $803.23, and the other in favor of his brother Louis, (which was charged to be fraudulent,) to secure a note for $3,265 which was dated January 3, 1891, and was payable one day after date, with interest at the rate of 10 per cent. per annum. Within one week thereafter he also executed six other mortgages on the same stock of goods to secure debts due to other parties, but these mortgages were made subject to the lien in favor of

the bank and his brother Louis. The entire stock was eventually sold in behalf of the attaching creditors and mortgagees for about $4,500. Outside of the stock of goods thus mortgaged, and the real estate conveyed to Landes, it did not appear that John Clyne had any other property. The intervener claimed that the mortgage in his favor for $3,265 was given to secure money which he had previously loaned to his brother John, and had advanced to pay certain notes which the latter owed. It also appeared in evidence that on February 10, 1890, Louis C. Clyne had made a statement to a commercial agency showing that his net assets were then $12,843; that on February 11, 1891, he had made another statement, showing his net assets to be $21,500. It further appeared that the average profits of the intervener's business did not exceed $3,500 per year, and that the increase in his means between February, 1890, and February, 1891, was about equal to the sum of his average annual profits, and the value of the property which he was charged to have received in the mean time from his brother John, without consideration. The intervener made no effort to explain how it happened that his assets had increased to such extent during the year 1890.

C. S. Montgomery, for plaintiffs in error.

Robert Ryan, for defendant in error.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

THAYER, District Judge, after stating the facts as above, delivered the opinion of the court.

In view of the nature of the case, and the evidence offered to substantiate the allegations of fraud, we think that some of the exceptions to the charge are well founded. In the course of the charge the trial court made use of the following language:

"A great deal has been said about brothers, and the conspiracy between them. I do not know of any testimony that tends to show any conspiracy between the brothers for the purpose of defrauding creditors, so far as I am able to see, and I think I ought to say to the jury that under no circumstances does the testimony justify [the inference] that there was a conspiracy entered into between the brothers for the purpose of defrauding these creditors of John Clyne."

We are unable to regard this portion of the charge as a mere opinion as to what the finding ought to be, such as a court is entitled to express, if, in its judgment, the case is one which warrants such action. It was a definite statement to the jury that there was no testimony, so far as the court could see, which tended to show the existence of such a conspiracy to defraud the creditors of John Clyne as the plaintiffs in error had alleged; and it was reinforced by the further remark, that under no circumstances would the testimony justify the conclusion or inference that such a scheme had been formed. The statement as made, even if it could be regarded as a mere expression of opinion on a question of fact, was not supplemented by the further statement that the jury were at liberty to disregard such opinion, if they thought proper. We are unable to see that there is any material difference between such a direction as was given, and a peremptory instruction to return a verdict in favor of the intervener. The sole issue in the case was whether the mortgage of date January 3, 1891, had been contrived by and between John and Louis C. Clyne with a view of hindering, delaying, or defrauding the creditors of the former. While that

issue was ostensibly left to the determination of the jury, yet it seems to have been submitted to the triers of the fact under directions from the court which practically left them no freedom of action. We cannot presume in view of the very positive assertion that there was no evidence to support the charge of fraud and collusion, that the jurors took a contrary view, and that they fairly exercised their undoubted right to weigh the evidence bearing on that issue, and to determine it as they thought proper. We entertain no doubt that the facts and circumstances developed on the trial formed a sufficient basis for an inference that the chattel mortgage in controversy had been executed under an arrangement, express or implied, between the mortgagor and the mortgagee, with a view of withdrawing a portion of the mortgagor's property from the reach of his creditors. Whether that was a justifiable inference, in view of the relationship of the parties, and all of the circumstances in evidence, was peculiarly a question for the jury, and the jury should have been left at full liberty to determine it. A peremptory instruction to return a verdict in favor of the intervener would have been erroneous, and the course actually pursued seems to us to have been equally prejudicial.

The contention of the plaintiffs in error in the lower court appears to have been that the evidence justified an inference that John Clyne was not indebted to his brother Louis on January 3, 1891, when the chattel mortgage was executed, or, if he was indebted to him in any sum, that he was not then indebted to the amount of the mortgage, and that the amount of such indebtedness had been intentionally exaggerated to cover up the mortgagor's property. With reference to that contention the trial court charged the jury as follows, and an exception was duly taken by the plaintiffs in error:

"But there is another attitude in which that claim may be placed. I know there is a controversy, and of course you know that there is a controversy, between the parties, as to the existence of this indebtedness from John to Louis of $3,500, $3,200, or $3,600, or whatever sum it is. The testimony may satisfy you that at least a portion of that indebtedness existed at the time that the mortgage was given; and, if it does, it will be the duty of the jury to find that fact, and for the mortgagee to that extent, as I think, in any event. You may believe from the testimony, all taken and considered together, that the real indebtedness from John to Louis Clyne did not equal $3,200, and that the mortgage was given for the purpose of covering up a part of the property on which the mortgage was given. If the testimony does not satisfy you that the whole of it was due, then you ought to find from the testimony just what amount was due at the time of the giving of the mortgage from John to Louis."

The same idea, in substance, was conveyed in another part of the charge, where the court gave directions as to the form and amount of the verdict. It is evident, we think, that this portion of the charge was vicious, and prejudicial to the plaintiffs in error. It declared, in effect, that if a debtor executes a mortgage in favor of his creditor for a greater sum than is due to him, and with intent to cover up a part of his property, such mortgage may nevertheless be upheld as a valid security for whatever sum is actually due to the creditor. This is not the law, if the creditor accepts the ·

mortgage with knowledge that his claim has thus been intentionally exaggerated. A mortgage executed by a debtor in failing circumstances, for a sum known to be in excess of what is actually due to a creditor, is presumptively fraudulent. From the fact that the jury found that the sum due, of principal and interest, on November 25, 1891, was only $3,265.50, it would seem that they must have concluded that the indebtedness of the mortgagor to the mortgagee on January 3, 1891, was considerably less than the face of the mortgage. Under these circumstances, we are not able to say that the misdirection last complained of was a harmless error.

It is further assigned for error that the court gave the following direction:

"A great deal has been said about the testimony that relates to the store buildings. Suppose that all that was claimed with reference to that is actually true; that it was originally conveyed by John Clyne to Joseph Clyne for the purpose of cheating and defrauding and hindering the bank in the effort of collecting its debt; that Joseph kept it, and after a while it was transferred from Joseph to Louis, without any consideration whatever; and that Louis held it as a pledge or security for the payment of his alleged debt. He would not be bound to rely on that at all. If he got other security, he could rely on the other security for the payment of his debt, and have a perfect right to receive a chattel mortgage for the payment of that debt."

In this instruction there is an evident assumption that Louis C. Clyne received the conveyance of the Maple Park property as security for the debt of John Clyne, which was subsequently further secured by the chattel mortgage in controversy, and upon that assumption the court proceeded to direct the jury that the intervener had a perfect right to take such additional security, and to rely upon it. The record shows, however, that there was no testimony to support the assumption on which the instruction was predicated. The attaching creditors claimed that the conveyance of the Maple Park property to the intervener was but one step in a scheme whereby John Clyne had attempted to withdraw a portion of his property from the reach of his creditors, and that Louis C. Clyne held the Maple Park property in secret trust for his brother John. On the other hand, all of the evidence offered by the intervener tended to show, and such was his contention, that he had bought the Maple Park property outright from his brother Joseph Clyne, the real owner, for the sum of $3,000. We think, therefore, that the portion of the charge last quoted was misleading, and for that reason erroneous. An instruction ought not to be predicated upon a purely hypothetical state of facts, for which neither party contends. Instructions of that kind tend to divert the attention of a jury from those issues which are really in controversy.

We are also of the opinion that the trial court erred in directing the jury, in substance, that they should ignore all of the evidence concerning "the alleged transfers of Joseph Clyne," and "what he had said and done." It was clearly competent for the attaching creditors to show, as they did show, that John Clyne had transferred all of his real estate at Stafford, Kan., to E. H. Landes, in November, 1890, with the understanding that the latter should convey it to Joseph Clyne, and that such conveyance was subse-

quently made by Landes. It was also competent to show Joseph Clyne's connection with the Maple Park property. All of this testimony had a direct bearing on the issue whether John Clyne had acted in good faith in executing the chattel mortgage, or whether that was merely one step in a scheme to cover up his property, and to defraud his creditors. The direction given, to ignore all evidence of what Joseph Clyne had said and done, and all evidence of alleged transfers of property, seems to us to have had the effect of withdrawing from the jury much relevant and competent testimony, and that the action of the court in that respect was erroneous.

Some exceptions were also taken to the action of the trial court in excluding testimony. With reference to such exceptions, it is sufficient to say, that in our judgment they are without merit. Such relevant and material facts as were at first excluded were eventually proven by intervener's own witnesses. Under these circumstances, we do not see that the plaintiffs in error have any just cause for complaint. For errors apparent in the charge, the cause is reversed and remanded, with directions to grant a new trial.