In the Matter of LAS COLINAS, INC., and Eastern Shore Development Corporation, Debtors, Appellants.

Appeal of Vigdor SCHREIBMAN, Appellant.

No. 7469.

United States Court of Appeals, First Circuit.

Heard March 3, 1970.

Decided May 14, 1970.

See also D.C., 294 F.Supp. 582.

Vigdor Schreibman, pro se and as attorney-in-fact, for appellants.

Vicente Zayas Puig, San Juan, P. R., with whom Baragano, Trias, Saldana & Francis, San Juan, P. R., was on brief, for Banco Popular de Puerto Rico, appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Appellants, Las Colinas, Inc. and Eastern Shore Development Corporation, are debtors in possession in proceedings brought under Chapter XI of the Bankruptcy Act. Their controversy with Banco Popular de Puerto Rico arises out of a plan to develop a large tract of land in Puerto Rico for residential and recreational purposes. The idea was conceived by Vigdor Schreibman and put

into effect in 1961 by the appellants.[1] The bank provided interim financing in exchange for promissory notes secured by mortgages on certain portions of the land. By the end of 1963 differences between the parties led the bank to refuse to advance further funds, and, shortly thereafter, construction came to a halt. As the result of this impasse, in July 1964 the bank sued in the Commonwealth Superior Court to foreclose the mortgages.[2] Three months later appellants filed for an arrangement pursuant to Chapter XI.[3]

The present appeal is brought by the debtors in possession from an adverse decision of the bankruptcy court permitting the bank to have certain of the mortgaged property sold at public auction to satisfy the indebtedness.

Before turning to the merits of the case, we must determine whether or not the scope of our review is affected by the fact that the lower court, in rendering its opinion, adopted almost verbatim the proposed findings of fact and conclusions of law submitted by the bank at the close of trial so that the entire opinion occupying some twenty printed pages was written from end to end by counsel. Appellants contend that this adoption of findings and conclusions drafted by an interested party was improper, that the opinion does not reveal the discerning line for decision of some of the basic issues in the case and that under the circumstances we should render a decision on the merits in favor of the debtors.

■ Fed.R.Civ.P. 52(a) requires the trier of fact to find the facts specially and state his conclusions of law regarding the grounds of the action. The purpose of the rule, it is said:

> "is to require the trial judge to formulate and articulate his findings of fact and conclusions of law in the course of his consideration and determination of the case and as a part of his decision making process, so that he himself may be satisfied that he has dealt fully and properly with all the issues in the case before he decides it and so that the parties involved and this court on appeal may be fully informed as to the bases of his decision when it is made." Roberts v. Ross, 344 F.2d 747, 751 (3d Cir. 1965).

■ The practice of inviting counsel to submit proposed findings of fact and conclusions of law is well established as a valuable aid to decision making. Nordbye, Improvements in Statement of Findings of Fact and Conclusions of Law, 1 F.R.D. 25, 30 (1940). Nonetheless, a clash of interests must be recognized to exist between efficient administration that leads hard pressed judges to turn to counsel for help and the undeniable right of losing counsel to be assured that his position has been thoroughly considered. The court's findings must ultimately represent the judge's

---

1. Originally five corporations were involved in the project: Las Colinas, Inc.; Arenas, Inc.; Ceiba Corporation, Eastern Shore Development Corporation and Eastern Construction Corporation. Las Colinas, Inc. originally purchased all of the properties comprising the project. Arenas, Inc. purchased 100 cuerdas from Las Colinas and was the developer of section one. Eastern Shore Development Corporation contracted to perform services required for general planning, financing and sales promotion for the entire project. Eastern Construction Company, a wholly owned subsidiary of Eastern Shore, was hired as prime contractor. In 1964 all the corporations except Eastern Shore were merged and took the common name Las Colinas, Inc. Schreibman is president of both corporations.

2. By agreement of the parties these proceedings were later terminated and jurisdiction over all issues was transferred to the district court sitting in bankruptcy. This included a counterclaim filed by Las Colinas for $5,000,000 in actual and punitive damages.

3. An attempt by a creditor to transfer the proceedings to a Chapter X Reorganization was the subject of prior litigation before this court. Schreibman v. Mason, 377 F.2d 99 (1st Cir. 1967).

own determination. United States v. Forness, 125 F.2d 928 (2d Cir.), cert. denied, City of Salamanca v. United States, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942). The independence of the court's thought process may be cast in doubt when the findings proposed by one of the parties winds up as the court's opinion [4] and the courts have not looked with favor upon the practice.[5] The district court's action in this case does not in any way alter its deserved reputation for conscientiousness. We suspect no abandonment of judicial responsibility. At the same time we have a concern that as a matter of general practice in all courts within our jurisdiction the appearance reflects the actuality.

In Nyyssonen v. Bendix Corporation, 342 F.2d 531, 532 (1st Cir.), cert. denied, 382 U.S. 847, 86 S.Ct. 63, 15 L.Ed. 2d 86 (1965), this court considered the contention that, by adopting a portion of defendant's draft findings of fact verbatim, the district court denied plaintiffs due process of law. Although we rejected that contention, we expressed the view that "ordinarily we think it the better practice for the trial court to prepare its own findings with such help as it may derive from counsels' requests." We were emphatic that *Nyyssonen*, a complex patent litigation, was not an ordinary case. The district judge, while candidly recognizing his own limitations in the area, left no doubt that to the best of his ability he had made an independent study of the record. Under the circumstances, we thought him justified in adopting the proposed findings in order to avoid the risks of scientific and technological error. *See* Radio Corporation of America v. Philco Corporation, 275 F.Supp. 172, 210 (D.N.J.1967).

The issues confronting the court in the instant case do not resemble those in *Nyyssonen*, and we reiterate that we think the practice of adopting proposed findings verbatim should be limited to extraordinary cases where the subject matter is of a highly technical nature requiring expertise which the court does not possess.

Nevertheless, the Supreme Court, in an antitrust action, has held

---

4. The danger inherent in the practice is well stated in Brenger v. Brenger, 142 Wis. 26, 125 N.W. 109 (1910), quoted in Otis, Improvements in Statement of Findings of Fact and Conclusions of Law, 1 F.R.D. 83, 85 (1940):

   "Experience shows that counsel, the most able, honorable and conscientious, * * * after the close of a hotly contested case, are not in the frame of mind, ordinarily best suited to drafting the findings, which must express the judgment of the court. That is no criticism. It is only an acknowledgment of the natural infirmities of the most perfect of us. All are affected regardless of ability or purity; the difference is in degree. The making of the findings is purely a judicial function."

5. United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12 (1964); Roberts v. Ross, 344 F.2d 747, 752 (3d Cir. 1965); Nyyssonen v. Bendix Corp., 342 F.2d 531 (1st Cir. 1965); Rooted Hair, Inc. v. Ideal Toy Corp., 329 F.2d 761, 769 (2d Cir.), (concurrence), cert. denied, 379 U.S. 831, 85 S.Ct. 63, 13 L.Ed.2d 40 (1964); Chicopee Mfg. Corp. v. Kendall Co., 288 F.2d 719, 724 (4th Cir.), cert. denied, 368 U.S. 825, 82 S.Ct. 44, 7 L.Ed.2d 29 (1961); compare Louis Dreyfus & Cie. v. Panama Canal Co., 298 F.2d 733 (5th Cir. 1962), with Atwood v. Humble Oil and Refining Co., 338 F.2d 502, 512 (5th Cir. 1964), cert. denied, 381 U.S. 926, 85 S.Ct. 1562, 14 L.Ed.2d 684 (1965). See also Otis, Improvements in Statement of Findings of Fact and Conclusions of Law, 1 F.R.D. 83, 85 (1940); Wright, The Non Jury Trial —preparing Findings of Fact and Conclusions of Law, quoted in United States v. El Paso Natural Gas Co., supra, 376 U.S. at 656–657, 84 S.Ct. 1044 n. 4. But see Bradley v. Maryland Casualty Co., 382 F.2d 415, 422–423 (8th Cir. 1967); Schnell v. Allbright-Nell Co., 348 F.2d 444, 446 (7th Cir. 1965), cert. denied, 383 U.S. 934, 86 S.Ct. 1062, 15 L.Ed.2d 851 (1966); United States v. Cornish, 348 F.2d 175, 181 n. 8 (9th Cir. 1965); O'Leary v. Liggett Drug Co., 150 F.2d 656, 667 (6th Cir.), cert. denied, 326 U.S. 773, 66 S.Ct. 232, 90 L.Ed. 467 (1945); See generally 2B W. Barron & A. Holtzoff, Federal Practice and Procedure § 1124 (Wright ed. 1961).

that "findings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." United States v. El Paso Natural Gas Co., 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L. Ed.2d 12 (1964). That is not to say, however, that courts will not make the most searching examination for error in such cases. In Louis Dreyfus & Cie. v. Panama Canal Company, 298 F.2d 733 (5th Cir. 1962), the court held that even though the clearly erroneous rule was not erased by the practice of adopting counsels' proposals, without the "badge of personal analysis," reviewing courts in close cases should feel more justified in remanding with a direction that further findings be made.[6] See Roberts v. Ross, *supra*, 344 F.2d at 752. The factors that led the *Dreyfus* court to find that "maximum doubt is cast on the findings of fact by their adoption from the litigant's proposals" are also present in the instant case. Both involve lengthy opinions containing discussion of numerous issues and sharply disputed facts founded upon evidence largely oral in nature. Consequently, we deem it appropriate to apply the *Dreyfus* standard to the facts developed in the opinion of the court below.

We in no way suggest that courts may not receive conventional requests for findings and adopt those submitted by one party and reject those of the other. However, the greater the extent to which the court's eventual decision reflects no independent work on its part, the more careful we are obliged to be in our review.

### 1. The Loans

Beginning in 1961, Schreibman and certain bank officials negotiated to establish the terms under which the bank would undertake the financing of the project. The bank initially agreed to finance the development of a fifty cuerda[7] tract, further financial assistance to be conditional on the success of this first section. On the basis of plans, budgets, cost estimates and an estimated time of completion of six months, the bank, on September 19, 1961, approved a line of credit for site development in the amount of $482,000. The six month projection to complete the project proved optimistic, as work on the site did not get under way until March, 1962. On September 18, 1962, while work on the land was still in progress, the bank extended a second line of credit for $500,-000 to be used for the construction of forty-six houses in the first section. The court found that both loans were to be repaid from the proceeds of the sale of lots and houses, and that although no time was specified, repayment was to be made within six months of each loan or within a reasonable time thereafter. In neither case was the deadline met.

Despite the fact that the work on both land and houses was incomplete in February–March 1963, the court found that on June 18, 1963, the bank increased the line of credit by $768,000, bringing the total to $1,750,000. As found by the court, this amount represented a maximum figure to be used to finish the site development and the construction of forty-six houses in the first section.[8] Although the evidence disclosed no time for repayment, again the court concluded that the parties intended repayment to be made within six months. Accordingly, it held that in the absence of conclusive evidence to the contrary, the bank was entitled to demand payment in December 1963 of all sums owed to it.

Although there is no disagreement that the source of repayment was to be

---

6. The governing principles are described by the court in *Dreyfus, supra*, at 738–739.

7. A cuerda is just less than an acre.

8. Although the parties are not in agreement as to whether the bank had given its approval to construct more than forty-six houses, the court found that the bank was aware of the fact that more than that number of units were being built and had given its reluctant approval for at least partial financing of these additional units.

the sale of lots and houses, appellants dispute the finding that under the terms of the agreement the $1,750,000 credit line was a gross amount to be repaid in a lump sum at a specified time. Schreibman testified that the financing was to be accomplished by a revolving line of credit. Under this system, the bank would make loans up to $1,750,000 to develop section one. As lots and houses were sold, the proceeds would be used to reduce the amount of the indebtedness. The bank would then make further loans to enable the appellants to prepare more lots and houses for sale. By this method the total indebtedness would never exceed $1,750,000, although the total cost of development might be much greater. Schreibman further testified that in December 1963, the appellants stood ready to begin revolving the loan, but that the bank repudiated its agreement.

Schreibman also testified that a comprehensive budget for section one was not available until January 1963 and that it was May 1963 before it was submitted to the bank in final form. This "Arenas Final Budget," set forth the full cost for the completion of section one, the construction of ninety-two houses and general administrative expenses.

The total was estimated to be $2,-771,467.82. It is apparent that a question of central importance on the issue of whether the line of credit granted on June 18, 1963, was a revolving one was whether the Arenas Final Budget was accepted by the bank. If it was, then only by viewing the $1,750,000 as a revolving credit line could completion become a reality. Although appellants presented evidence on this issue,[9] the court did not make adequate findings of fact with reference to it.

Rather than addressing itself to this question, the court's opinion turns on whether it would be "contrary to business sense and common sense" to set a time for repayment beyond the projected completion date,[10] whether any reasonable bank would commit itself to a project without waiting to see the outcome of the first stage, and on an internal loan memorandum submitted by the bank. The court relied on the testimony of the "bank's officials" to establish that "the six-month period seems to be the period of time agreed upon," although it expressly found that there was no evidence of an agreement as to any extension of time to complete the works after the line of credit was increased to $1,750,000.[11] The time projections the

---

9. Notwithstanding their disagreement respecting the total cost of completing section one and the manner of repayment, the parties stipulated as to the mechanism by which the work was to be financed as it proceeded. Arenas would submit for approval cost estimates requesting funds for a specified purpose. Subsequently, requisitions would be submitted to the bank showing that the purpose of the amounts requisitioned was in the amount shown in the previously accepted cost estimates. The record discloses that the requisitions submitted and approved subsequent to May 15, 1963, gave the amount of the budget for house construction as that stated in the Arenas Final Budget. Appellants take the position that this is some evidence that the guidelines set forth in the Arenas Budget had been accepted. Appellants also submitted evidence which they contend demonstrates that no matter whose figures are used, the $1,750,000 would have been inadequate to complete the project.

The bank contends that whatever the credit arrangement, by December 1963, it had already advanced $1,776,532.63 or $26,532.63 beyond the line of credit approved, and was therefore released from any reciprocal obligation. Appellants dispute this contention. In any event, the court did not base its decision on this point.

10. In fact, a revolving credit line is a long recognized credit device. Schneider-Davis Co. v. Hart, 23 Tex.Civ.App. 529, 57 S.W. 903 (1900).

11. Apparently the officials relied on are Soto and Kalisch. We regard their testimony as extremely tenuous. The bank represents in its brief that Soto testified that the credit in the amount of $768,000 was intended to be paid in six months. Examination of the cited testimony discloses that Soto was testifying as to a loan of $188,000 made in February 1963, which was within the prior lines of credit, and had nothing to do with the line

court relied on were those under the first two loans, which had obviously been abandoned as unrealistic when the work did not get started on schedule. The court's further ruling that the six month projections "refute the assertion that the bank had agreed to readjust the financial commitments according to preliminary or additional budgets to be submitted by Debtors" is the only mention made of the Arenas Final Budget, and in view of the foregoing is totally inadequate.

Several times the court repeated its conviction that it was most improbable that a bank would commit itself to a multimillion dollar project before seeing the results of the first section. But that sentiment is a mere abstraction. The issue is what this bank did, and that cannot be resolved until the questions raised by the Arenas Final Budget are dealt with.

The court also relied on an internal loan memorandum to establish that the amount loaned was not to exceed $1,750,000. But Kalisch testified that these forms "are administrative guides, they do not necessarily represent the facts as they existed."

█ We have said that the clearly erroneous rule is not abrogated where the district court adopts verbatim the proposed findings submitted by one of the parties. However, we think this case falls within the "narrow range of doubtful cases" in which the absence of the "badge of personal analysis" justifies

our conclusion that important evidence has been inadequately considered. *Dreyfus, supra,* 298 F.2d at 738–739. The question of whether the Arenas Final Budget was accepted is intimately connected with the question whether the loan was intended to revolve.[12] Appellants' evidence on that issue must be given thorough consideration. We see no alternative but to remand this part of the case for a finding on that question.

### 2. The $2,000,000 Mortgage

Each line of credit extended by the bank was evidenced by a promissory note secured by a mortgage on certain of the development land. The first line of credit for $482,000, granted on September 19, 1961, was secured by a bearer mortgage note in the amount of $500,000. This mortgage, executed on April 26, 1962, encumbered the land under actual development. The second line of credit, for $500,000, granted on September 18, 1962, was secured by a mortgage for a like amount. This mortgage was executed on February 5, 1963, and constituted a second lien on the same land mentioned above. On February 4, 1963, another mortgage in the amount of $750,000 was executed encumbering an undeveloped portion of the property. This $750,000 mortgage preceded by four and one-half months the final extension of the line of credit to $1,750,000. Finally, on December 20, 1963, the bank asked for and received additional security in the form of a $2,000,000 bearer mortgage note as a third

granted the following June. With reference to the bank's Exhibit E, Profit Projection and Financial Statement, Soto testified that "this report states conclusively that by December 23 they planned to have completed everything * * * and by that time they would have paid us out completely." Exhibit E contains no such statement. Finally, the court asked, "Did Mr. Schreibman specifically say he would finish by December and he would pay by December the full amount?" To this Soto replied, "Yes, sir." On cross-examination, counsel for the appellants brought out the fact that in prior proceedings this witness had testified that "no

specific time limit was fixed, but we did request from the corporation that they produce a schedule so that we could determine more or less what was the time in which they intended to perform these works."

Mr. Kalisch, the bank's investment director, would say only that he thought the time discussed was "within a year."

12. Significantly, Jose Luis Carrion, Executive Vice President of Banco Popular, testified that the second $500,000 line of credit for house construction was a revolving loan.

mortgage on the land under development. It is with this last encumbrance that appellants take issue.

They contend that the $2,000,000 mortgage, insisted upon by the bank at a time when the project was in financial straits, constituted grossly excessive security in view of the fact that the bank already held mortgages with a face value of $1,750,000 for loans of precisely that amount. They claim that the result of this transaction, which placed an encumbrance of $3,750,000 on their land, was the destruction of the project.

In upholding this transaction, the court found that prior to December 1963 the bank had security of only $1,000,000 which was less than the total loans outstanding. In fact the bank also held the $750,000 mortgage described above on an undeveloped section of land. At a meeting on December 18, 1963, the bank requested the $2,000,000 mortgage because, as the court found, it "preferred to have the additional mortgage security on land which was being developed and where the amounts advanced by it were expended." Although the court recognized that the $2,000,000 mortgage exceeded the actual debt, it held that it was not unreasonable in view of the fact that the parties were at that time negotiating for future advances. Thus, "it seemed practical and logical to issue and deliver a mortgage note in excess of the debt which could serve as security in case the request for additional financing was approved by the Bank." 294 F. Supp. 582, 593. The court also found that there was no evidence that an agreement regarding these additional funds was ever consummated.

In a corporate resolution dated December 20, 1963, authority was given to Schreibman as president to execute a promissory note secured by a mortgage for $2,000,000 "as additional security of loans made prior to this date and as security of advances to be made by the banking institution subsequent to this date." The court found that the mortgage documents were consented to by almost all the directors, the majority by written consents on December 20 and "the others by telephone."

At the time of the transaction, Las Colinas had a board of directors consisting of seven members. Of the four directors who actually signed the authorization, two were also officers of the bank.[13] Of the three who did not sign, two were out of the country and, contrary to the finding by the district court, did not give their consent by telephone.[14] The third, Summers, was attorney for Las Colinas. He testified that he intended to sign and did sign, thinking it critical that they secure additional financing from the bank. Inexplicably his signature does not appear on the corporate resolution. Even if Summers is counted among the approving directors, however, it is apparent that the resolution could not have carried without the votes of the two bank officers.

Appellants contend that the participation of Kalisch and Conde puts the case in the same category with interlocking directorate cases, in which the burden of proof on the issue of fairness is on the party seeking to uphold the transaction. Geddes v. Anaconda Copper Mining Company, 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425 (1921). The bank would distinguish the instant case by the fact that the two bank officers had no personal interest in the transaction, did not benefit from it, did not own shares or request to be appointed directors. It relies heavily on 3 W. Fletcher,

---

13. Abner Kalisch, Sr., Vice President of Banco Popular, and director of the investment division, and Carlos Conde, Assistant Vice President, Investment Department.

14. Attorney Summers testified that he and Schreibman made the telephone calls. One director could not be reached. The other refused to consent over the telephone. Neither ever consented in writing.

Cyclopedia on Corporations § 968 (1958), which states:

> "A director of one corporation may vote or otherwise seek in a legitimate way security for an honest debt due from that corporation to another of which he happens to be an officer."

But reliance on this statement begs the question of whether the transaction was in fact legitimate. Nor does it deal with the question presented here of who bears the risk of non-persuasion.

■ We perceive no reasoned distinction between the interlocking director cases and those where the same individual serves one corporation as a director and another as an officer. The principle that one who is in a fiduciary capacity cannot serve two masters is no less controlling where, despite his title, he is so placed that his decisions affect the financial condition of two companies. Modern corporation law has erased such artificial distinctions.[15] Such was the law in this circuit as early as a half century ago. Irving Bank-Columbia Trust Company v. Stoddard, 292 F. 815 (1st Cir. 1923). There, loan agreements and assignments had been made by the directors of the defendant company while they were also officers or representatives of the banks extending the loans. These facts, we held "casts upon those who seek to uphold the transaction the burden of showing that it is fair and absolutely free from fraud." *Irving Bank, supra,* at 819. Although the Supreme Court of Puerto Rico has not passed on this issue, it has voiced its concern for transactions in which a fiduciary's personal interest may be in conflict with that which he is bound to protect. McCormick v. Gonzalez, 49 P.R.R. 460, 469 (1936).

The record before us reflects an utter failure to demonstrate the fairness of the transaction. The amount of the mortgage demanded by the bank was, as the court recognized, far in excess of the outstanding indebtedness. The only justifications offered for this exorbitant security are (1) that future advances were under consideration and it was reasonable for the parties to include this in their calculations and (2) that the land encumbered by the $750,000 mortgage was "not the best security." Whatever negotiations were taking place regarding future advances, the fact of the matter is that no mention of that subject is found in the mortgage deed and no such loans ever materialized.[16] In any event,

---

15. R. Baker and W. Cary, Cases & Materials on Corporations 440 (3d ed. 1959); *see* N.Y. Business Corporation Law § 713 (McKinney's Consol.Laws, c. 4, Supp. 1969): "Interested directors.—(a) No contract or other transactions between a corporation and one or more of its directors, or between a corporation and any other corporation, firm, association or other entity in which one or more of its directors are directors or officers, or are financially interested, shall be either void or voidable for this reason alone or by reason alone that such director or directors are present at the meeting of the board, or of a committee thereof, which authorized such contract or transactions, or that his or their votes are counted for such purpose:

＊　　＊　　＊　　＊　　＊

(3) If the contract or transaction is fair and reasonable as to the corporation at the time it is authorized by the board, a committee or the shareholders." *See also* Calif.Gen.Corp.Code § 820 (Deering Supp.1970); 8 Del.Gen.Corp.Law § 144 (West Supp.1968).

16. Butts v. Peacock, 23 Wis. 359 (1868), was a suit by a creditor to hold a mortgage fraudulent and void on the ground that the transaction in question tended to hinder and delay the creditors of the mortgagor. The court held that the fairness of the transaction must be judged by the surrounding circumstances. The mortgage was given, the court found, at a time when the mortgagor was in financial trouble, pressed by his creditors and apprehensive that he would lose everything. The creditor knew of this before he took the mortgage, nevertheless, he took a mortgage of $1100 on all the mortgagor's property to secure an indebtedness of only $570. Although he claimed that it was intended to cover future advances, "nothing of the kind appeared on the face of the mortgage, which purported to be for an absolute existing indebtedness." The court held the mortgage void as against creditors. *See* Kellogg v. Clyne, 54 F. 696, 700 (8th Cir. 1893).

even by the debtors, projected figures to finish the project, this security would have been excessive.

■■■■ As to the value of the land encumbered by the $750,000 mortgage, the bank offered no evidence to show that it was not what its face value indicated.[17] This was part of the bank's burden on the issue of fairness, and in the absence of evidence to the contrary, the face value shall be presumed to coincide with its actual value. The fact that the parties had entered into an agreement whereby appellants pledged to deliver such security as the bank deemed adequate does not affect the result here. That agreement cannot prevail against a charge of unfairness.

The appellants are entitled to receive such damages as they have shown resulted from this transaction. On that issue, this segment of the case is also remanded. In determining the amount of damages, the court, on remand, shall not take into consideration appellants' allegation that they were deceived into thinking that an agreement had been struck to make the advances and substitute the $750,000 mortgage. Contrary to his own position, Schreibman testified on direct examination that the mortgage was intended as additional security and that at the time it was given no obligation was incurred by the bank. In light of this testimony, we need not undertake any further examination of the evidence in order to hold that the district court's finding on that issue is supported by the evidence. This is in no way inconsistent with our ruling that the bank failed in its burden to show that the security was not grossly excessive in light of the surrounding circumstances.

### 3. The 196 Cuerda Property

■■■■ In 1960 Las Colinas purchased three tracts totalling 390 cuerdas from the Penedo family, giving a purchase money mortgage as security for part of the price. Upon a default in payment, the Penedos foreclosed the mortgage and the bank purchased a 196 cuerda portion of the property at a judicial sale. Appellants now seek to have the bank divested of title on the ground that the purchase money mortgage given Penedo was void for failure to comply with § 215 of the Mortgage Law, 30 L. P.R.A. § 215 (1966),[18] which provides, in essence, that where several estates are mortgaged to secure a single obligation, the amount of the lien borne by each must be set forth in the instrument.[19] This contention raises two issues: (1) whether the bank, a stranger to the original transaction, holds subject to any such infirmity in the mortgage and (2) whether the mortgage complies with § 215. We shall dispose of the first point briefly.

17. Quite to the contrary, one Nazario, an expert witness called by the debtors in possession, established the value of the undeveloped land at between $2,000–$2,500 per cuerda. There were 586 cuerdas in the parcel securing the $750,000 note.

18. The bank claims that appellants are estopped to deny the validity of the mortgage because the issue they raise was litigated in the Penedo foreclosure proceeding in the Commonwealth courts and determined adversely to their interest. We cannot agree. Collateral estoppel, even if applicable here, is an affirmative defense. Fed.R.Civ.P. 8(c). The bank's failure to raise it in the district court precludes its assertion here. C. Wright & A. Miller, Federal Practice and Proce-

dure: Civil § 1278 (1969); see Badway v. United States, 367 F.2d 22 (1st Cir. 1966).

19. We note in passing that no objection has ever been made to the fact that Penedo was not joined as a party under Fed. R.Civ.P. 19. An appellate court may raise the question of want of an indispensable party sua sponte. 3A J. Moore, Federal Practice ¶ 19.07[1], at 2223 (2d ed. 1969); 2 W. Barron & A. Holtzoff, Federal Practice and Procedure § 516, at 160–163 (Wright ed. 1961) and (Supp. 1968). We are satisfied, however, that Penedo was not an "indispensable" party. 3A J. Moore, supra, at 2253; Stevens v. Loomis, 334 F.2d 775, 777–778 (1st Cir. 1964).

A mortgage which fails to comply with § 215 may not be recorded in the registry.[20] And, since under Puerto Rican law recording is essential to the validity of a mortgage,[21] one that is not recorded is a nullity.[22] Moreover, the inadvertent admission to record of a void instrument does not cure the infirmity.[23] Finally, subsequent purchasers of land are protected against such void instruments only to the extent that the defect in title is not apparent from the record.[24] Since a violation of § 215 is apparent on the record, as the mortgage is open to inspection, the bank is not protected against any alleged violation.[25]

This brings us to the question of the mortgage's compliance with § 215. In paragraph Tenth the mortgage distributes the amount of the lien among three parcels in rough congruence to their sizes. This much of the instrument, appellants concede, meets the requirements of § 215. By paragraph Eleventh, however, the land is redivided into four parcels of approximately 100 cuerdas each, and it is stipulated that the mortgagee will release from the mortgage lien one of the four 100 cuerda parcels upon the payment of one-quarter of the total indebtedness. Paragraph Twelfth goes on to state that none of the land would be released from the mortgage lien until the mortgagor had made payments of $125,000 toward the reduction of certain other mortgages,

which do not appear in the record, and the instant mortgage.

The parties are agreed that paragraph Eleventh and Twelfth nullify the distribution of the debt made by paragraph Tenth. Appellants contend that the instrument as a whole violates § 215 and is void. Appellees argue that the offending provisions are void, but severable from the mortgage.

We think the result here is controlled by Credito y Ahorro Ponceno v. Registrar, 30 P.R.R. 131 (1922). In that case, the mortgage distributed the indebtedness among several parcels in accordance with § 215. However, by subsequent paragraphs it stated that each of the mortgaged properties was to respond for the entire debt and that none of the liens on the properties would be cancelled until the entire debt was cancelled. The Supreme Court of Puerto Rico upheld the refusal of the registrar to record the mortgage on the ground that it violated § 215. Hence, the court held that subsequent mortgage provisions contradicting a distribution made under § 215 render the entire mortgage unrecordable.

While we are dealing here with a mortgage which, under *Credito*, was erroneously recorded, the distinction is immaterial. We are bound to follow Puerto Rican law in this matter. And since under Commonwealth law, a void mortgage is not validated by inadvertent recording,[26] it follows that a mortgage

20. J. M. Portela & Co. v. Registrar, 41 P.R.R. 281 (1930); cf. 30 L.P.R.A. § 1085 (1968).

21. 30 L.P.R.A. § 259 (1966); 31 L.P.R.A. § 5042 (1968).

22. See, e. g., Gaztambide v. Heirs of Ortiz, 70 P.R.R. 388, 402 (1949).

23. 30 L.P.R.A. § 58 (1966); Jiminez v. Alvarez, 69 P.R.R. 299 (1948).

24. Annoni v. Heirs of Nadal, 135 F.2d 499, 501 (1st Cir. 1943), affirming 59 P.R.R. 638, 642–644 (1941); Hernandez v. Caraballo, 74 P.R.R. 27, 34–35 (1952); Rivera v. Melendez, 72 P.R.R. 404, 410–411 (1951); Cruz v. Heirs of Gonzalez, 72

P.R.R. 291 (1951); Gaztambide v. Heirs of Ortiz, supra n. 22, at 400 (1949); King v. Fernandez, 30 P.R.R. 550 (1922).

25. The fact that the bank bought at a judicial sale puts it in no better position. Rivera v. Melendez, 72 P.R.R. 404, 410–411 (1951); see Ramos v. Rios, 79 P.R.R. 693, 696 n. 2 (1956); Gaztambide v. Heirs of Ortiz, supra n. 22, at 402–404; Santiago v. Rios, 69 P.R.R. 397 (1948); Ayala v. Flores, 50 P.R.R. 823 (1937); Delgado v. Rivera, 41 P.R.R. 784, 792–793 (1931); Anaud v. Martinez, 40 P.R.R. 641 (1930).

26. Note 21, supra.

which would not have been recordable—and would therefore have been a nullity—cannot become partially effective by virtue of an improper recording.

 While the foregoing is dispositive of the issue, we think it well to add that this result is entirely consistent with and, in our view, mandated by the policy of § 215. The purpose of that statute was to protect the general credit of the country by preventing creditors from taking excessive security for their debts.[27] The vice to be avoided was that the collateral of a debtor would be encumbered to a degree unwarranted by the outstanding debt, thereby preventing him from obtaining further financing. Under the mortgage in the instant case a prudent, potential creditor would look not only to paragraph Tenth to determine the extent of the mortgagee's interest in the land, but to paragraphs Eleventh and Twelfth as well. It is highly unlikely that a creditor would measure the mortgagee's interest by any standard other than that least favorable to the mortgagor. The inclusion of contradictory paragraphs in the mortgage of the type here involved would therefore have precisely the effect that the statute sought to avoid. To treat them merely as severable would be of no material benefit because a potential creditor could not rely upon the possibility of their eventual cancellation in deciding whether to advance funds to the mortgagee. Accordingly, the policy of the statute dictates that the entire instrument be treated as void.[28]

Our decision requires that the judgment be vacated and the case remanded for appropriate findings of fact after a complete re-examination of the evidence on the issue of whether the parties intended the financing to be by a revolving line of credit. On the issue concerning the execution of the $2,000,000 mortgage, the case is remanded for a determination of damages. The bank will be divested of title to the 196 cuerdas purchased at judicial sale and the parties shall be returned to the status quo.

The judgment of the district court will be vacated and the case remanded for further proceedings consistent with this opinion.

---

27. Credito y Ahorro Ponceno v. Registrar, *supra*, at 133.

28. Of course, the invalidity of the mortgage does not extinguish the obligation. Appellants also argue that the same provisions of the mortgage law render all the mortgages invalid because they resulted in a lien of $3,750,000 to secure a $1,750,000 debt without disclosing the amount of actual debt for which each property was responsible. Decision on this point is unnecessary in view of our disposition of the $2,000,000 mortgage issue.