**John D. ASKEW, Appellant,**

v.

**UNITED STATES of America and the Internal Revenue Service, et al., Appellees.**

**No. 81–2091.**

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1982.

Decided June 18, 1982.

James W. Gallman, Putman, Gallman & Dickson, Fayetteville, Ark., for appellant.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Carleton D. Powell, Joan I. Oppenheimer, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellees.

Before ARNOLD, Circuit Judge, STE-PHENSON, Senior Circuit Judge, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

This is a civil action for damages brought against the United States and the Internal Revenue Service for the alleged disclosure of certain bank records of John D. Askew to the government of Venezuela in violation of the Privacy Act. 5 U.S.C. § 552a. Askew appeals the judgment of the district court dismissing his complaint after a bench trial was held on the issue of liability. The issue before us is whether the district court's finding that there was no unlawful disclosure by the government is clearly erroneous. We hold that it is not and affirm the judgment of the lower court.[1]

I.

John Askew is a resident of Fayetteville, Arkansas, but he has been involved in the oil business in Venezuela—first as a welder and later as a contractor—since the 1940s. In the late 1960s Askew determined to use the many contacts he had developed in Venezuela and assumed the role of a promoter. He and his attorney negotiated a series of letter agreements with Dr. Armand Hammer, president of Occidental Petroleum Co., under which Askew would attempt to secure on behalf of Occidental service contracts granting oil and gas exploitation rights to certain areas of Venezuela's Lake Maracaibo. Askew was successful in securing these rights for Occidental in 1971. The relevant aspect of this arrangement to this litigation is Askew's subsequent receipt of $3 million from Occidental, most of which he then distributed in September and October 1971 to various influential Venezuelans who had been instrumental in Askew's success in obtaining the service contracts. A subsidiary of Occidental paid the money to a Bahamian corporation, Noark, Ltd., that Askew had formed for the purpose of receiving and distributing the funds. Askew distributed the money to the Venezuelans through checks drawn on Noark's checking account with the Canadian Imperial Bank of Commerce (CIBC) in Nassau, Bahamas.

Over the next several years, Askew suffered treble consequences as a result of these transactions. First the Internal Revenue Service uncovered the existence of the payment in 1973 during a routine audit of Askew's tax returns and requested financial records pertaining to Askew's receipt and disposition of the $3 million. Through his attorney, Askew delivered to the IRS the CIBC bank records of Noark, which included cancelled checks, debit memos reflecting wire transfers of funds from the account, and ledger sheets indicating monthly account balances.

Second, a lawsuit was filed against Askew in Texas in December 1974 by John G. Ryan, a former executive with Occidental's subsidiary corporation in Venezuela. Also named as a defendant in the suit was Perforaciones Altamar, C.A., a Venezuelan drilling company which was a contracting service company with Occidental and which was largely controlled by Askew. Ryan alleged that Askew and Altamar had tortiously interfered with his employment contract when Ryan was fired at their request after he discovered and began to question "irregularities" consisting of "illegal payments, forbearance and waiver of default [by Occidental] and breaches on the part of John D. Askew and Perforaciones Altamar, C.A." Government Ex. 3. In May 1975, Ryan amended his petition to add Dr. Hammer and David Martin, another Occidental executive, as defendants. Ryan further amended the petition to state in more detail

---

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. Because we affirm the district court's finding that there was no disclosure, it is unnecessary to address two alternative arguments raised by the government in support of the dismissal of this action: whether the information contained in the records was already in the public domain at the time of the alleged disclosure, and whether any alleged disclosure was authorized under the "routine use" exception of the Privacy Act. 5 U.S.C. §§ 552a(a)(7), (b)(3), and (e)(4)(D).

allegations that the defendants were involved in a scheme to bribe Venezuelan government officials by use of a company called Noark, Ltd., in order to obtain service contracts for Occidental. Government Ex. 4.

News of Ryan's allegations spread south, which led to the third consequence to Askew: discovery by the Venezuelan media and government of a possible scandal. In October 1975, both the judicial and legislative branches of the Venezuelan government began investigations into Ryan's charges of bribery. By February 1976, Askew had appeared once before the judicial investigating body and three times before the Bicameral Commission set up by the Venezuelan legislature. A climax, of sorts, was reached on February 15, 1976, when the President of Venezuela appeared on national television and announced that he had been conducting his own investigation and that he knew the names of the people who had accepted the bribes. The president also displayed a photocopy of a check for $106,400 that Askew had written on the Noark account to Alberto E. Flores T, dated September 6, 1971.[2] But for the display of this check, no names were announced by the president during his televised address; over the following days, however, the names of payees appeared in various Venezuelan newspapers. These names corresponded to the payees of some of the checks Askew had written on the Noark account and had turned over to the IRS. Askew was later incarcerated in Venezuela by a criminal court which held him pending the outcome of its investigation. Initially he was charged with bribery; later the charge was changed to conspiracy; and finally, after having spent four months in jail (July 19, 1976 to November 16, 1976), he was released when the charge was dismissed. Both the criminal court and the Bicameral Commission concluded that although money had definitely changed hands, none of the recipients was a government official.[3] Neither investigation was able to uncover any evidence that undue influence had been brought to bear on the negotiations between Occidental and the government.

Askew filed this action on January 13, 1978, alleging that sometime between January 13, 1976, and March 1, 1976, the IRS disclosed the cancelled checks and bank statements in violation of the Privacy Act[4] to the government of Venezuela and that Askew was incarcerated as a direct result of these disclosures. Askew admits that he has no direct evidence of any disclosure and relies entirely upon circumstantial evidence, comparing the information he gave the IRS with information obtained by the Venezuelan government, in attempting to establish his claim. The district court concluded that Askew had failed to carry his burden of proving an unlawful disclosure, adopted wholesale the proposed findings and conclusions of the government, and directed judgment entry in favor of the government.

## II.

Initially, we find disquieting the manner in which the district court made findings of fact and conclusions of law in this case. It is said that "[f]indings are adequate if they afford the reviewing court 'a clear understanding of the basis of the trial court's decision.'" *Allied Van Lines, Inc. v. Small Business Administration*, 667 F.2d 751, 753 (8th Cir. 1982) (citations omitted). The adequacy of findings is more apt

---

2. The government established at trial that the president must have obtained his copy of the check from a source other than the IRS. Askew apparently concedes this point because he makes no argument on appeal that a copy of the check was given to the president by the IRS.

3. Although one was formerly a government-employed economist and others were related to government officials.

4. Subject to certain provisions, § 552a(b) of the Privacy Act prohibits disclosure by federal agencies of records maintained about an individual without the prior written consent of that individual. Section 552a(g)(1)(D) provides that any individual who suffers an "adverse effect" because of agency failure to comply with § 552a(b) may bring a civil action against the agency, with jurisdiction in the United States district courts.

to be called into question when the trial judge—as was done here—adopts verbatim the proposed findings and conclusions of prevailing counsel, because more likely than not counsel "and properly so, in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can." Judge J. Skelly Wright, *Seminars for Newly Appointed United States District Judges* at 166 (1963). The result is that when the trial court adopts the proposed findings of counsel, losing counsel may well forfeit his "undeniable right . . . to be assured that his position has been thoroughly considered [;] . . . the independence of the court's thought process may be cast in doubt"; [5] and the reviewing court may well be left without a clear understanding of the trial court's basis for decision. Thus, while we acknowledge that the submission by counsel of proposed findings is frequently a valuable decision-making aid to the court, we disapprove of the court placing its imprimatur on such proposed findings by wholly adopting them as the court's own.

Certainly we could have benefited from a more detailed exposition of the rather convoluted facts in this case than the nineteen numbered findings of fact and two conclusions of law that were proposed by counsel for the government and adopted by the lower court. We are aware, however, that such findings, "though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964). Accordingly, we proceed to examine the support in the record for the lower court's findings.

## III.

Our examination of the record leaves us, on the one hand, with no completely crystallized picture of the events which unfolded in Venezuela during the course of the IRS and Venezuelan government investigations. On the other hand, the overall picture is sufficiently clear that, as to the findings of the district court, we are nowhere left with the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The picture that emerges is one in which the agents of the IRS, throughout their investigation of Askew's dealings, studiously avoided any contact with the Venezuelan government and media. Two of the three IRS agents who had physical control over Askew's records during the relevant period testified at the trial; [6] both said they made no contacts with or disclosures to the Venezuelan government or media. The testimony of William Messer and Al Giroux,[7] the agents mainly responsible for investigating the international aspects of Askew's dealings, indicates that the IRS investigation in Venezuela was carried out between December 1973 and April 1975. T. 249–50. Giroux, who handled the investigation in Venezuela, testified that Messer had sent a request from Dallas to find out more information about the various payees and what services they had rendered to warrant the large sums of money that Askew had paid them. According to Giroux, no contacts were ever made with any of the payees at the request of the U. S. Ambassador to Venezuela, who realized the political sensitivity of the case. T. 267–68. Furthermore, Giroux stated that he took special precautions with those portions of Askew's records that had been sent to him. The records were kept in his office safe when

5. *In re Las Colinas, Inc.*, 426 F.2d 1005, 1008–09 (1st Cir. 1970).

6. The third agent, Wylie Davis, is the local revenue agent in Fayetteville, Arkansas, and was the original recipient of Askew's records from his attorney. Davis did not testify at the trial and there is no contention that Davis re-

leased Askew's records to anyone outside of the IRS.

7. Messer was an International Issues Specialist with the IRS in Dallas, Texas, at the time and Giroux was the Revenue Service Representative in Caracas, Venezuela.

they were not in use, and only Giroux, his assistant, and his secretary had direct physical access to the records. Although the Ambassador did see Askew's records, "he did not have access to the files, as such." T. 283–84 (Giroux). By the time the imbroglio came to light in Venezuela in October 1975,[8] Giroux had completed his work on the case; he made arrangements to send the records back to the United States and they were sent back sometime between October and December 1975. He said that he was anxious to get the records out of Venezuela because "[I]f they [the Venezuelan government] started putting pressure on the Embassy, or they started putting pressure on me, or if the local people contacted me, I wanted to be able to say 'I don't have the file. I don't have the information.'" T. 277. Thus the record gives us every indication that in carrying out its investigation in Venezuela, the IRS strove to insulate itself from domestic political pressure and protect Askew's records in accordance with the Privacy Act.

Despite this uncontroverted evidence of nondisclosure by the custodians of Askew's records, Askew insists that he has established an inference of disclosure based on a comparison of the information that he gave the IRS with the information gathered by the Venezuelan government during the course of its investigations. Askew points to an attachment to his Ex. 9 which is a portion of the Venezuelan court records. The attachment, "El Movimiento De La Cuenta En Las Bahamas," is a list of the checks written by Askew on the Noark account along with the amount of each check and the name of its endorser. In addition, the list documents transfers of funds from the Noark CIBC account to

banks in New York, Panama, and Venezuela. While it is true that these data were contained in Askew's records which were under the control of the IRS, we are unable to agree with Askew that because the Venezuelan government also had such information, it must have been obtained from the IRS. In evidence are both the Bicameral Commission report (Plaintiff's Ex. 10/Government Ex. 2) and the Report of Proceedings before the Venezuelan Twelfth Criminal Court (Plaintiff's Ex. 11/Government Ex. 1). Neither document indicates that any official of the United States government was called to testify at these respective hearings. Nor is there any indication that officials of the United States government were ever approached by these investigatory bodies and solicited for information about Askew. As to the information regarding the checks themselves, the Venezuelan court report reveals that it went to a number of banks and directly solicited information which indicated payments were made by Askew through Noark to various Venezuelan nationals.[9] In addition, recipients of the payments themselves were called by the Venezuelan court to testify and all acknowledged receipt of money from Askew.[10] Thus, there is sufficient evidence to support the lower court's finding that the Venezuelan court verified the payments through sources other than the IRS.

Less certain is how the Venezuelan court was able to obtain specific information about some of the wire transfers of funds out of the Noark CIBC account. In at least one instance, there is evidence that the court discovered a wire transfer of $232,000 to the First National Bank in Caracas by inspecting the records of the transferee

8. Askew does not even attempt to argue that the IRS is responsible for the fact of the payments becoming known in Venezuela; the documentary evidence establishes that it was the filing of Ryan's lawsuit in Texas which first apprised the Venezuelan government and media of the situation. *See* Government Ex. 1 (Report of the Proceedings before the Venezuelan Courts) at 1; Plaintiff's Ex. 10 (Bicameral Commission report) at 21–22; Plaintiff's Exs. 1 and 8 (magazine and newspaper articles).

9. At least three different banks were named in the report as having been visited: the Banco de Comercio, the First National City Bank, and the Bank of Maracaibo in Caracas. Government Ex. 1 at 84–85, 107–08, 128–29, 142–43.

10. *See* Government Ex. 1 at 52–56, 62, 111, 130, 140–45.

bank. Government Ex. 1 at 85. Thus it would seem that in determining the amounts transferred, at least in some instances, the court had access to transferee bank records. Additionally, in three instances, the Venezuelan court was able to discover not only the amounts of the transfers, but also the amounts of the wire service charges that were assessed by CIBC against the Noark account. This leads Askew to argue that even if the Venezuelan court did discover the amounts of the wire transfers through the transferee banks, there is no way those banks would know the amount of the service charge since this, presumably, is a matter solely between the transferor bank and the account holder. Askew argues that Bahamian bank secrecy laws would have precluded the Venezuelan court from obtaining the information regarding the wire service charges directly from the CIBC. Thus he concludes that the amounts of these charges could only have been obtained from the debit memos he received from CIBC and which he subsequently turned over to the IRS. Although it is impossible from the record to determine where the Venezuelan court obtained this information, there is sufficient evidence to support the lower court's (implicit) finding that the IRS was not the source. We observe that the government of Venezuela was able to obtain more information than was the IRS in investigating this affair.[11] Even more significant is evidence in the record which indicates that the debit memos were never sent to Venezuela in the course of the IRS investigation. Messer, who had the complete bank records in Dallas, testified that he did not send all of Askew's records to Caracas; he only sent copies of checks made out to third parties in furtherance of his effort to find out whether any of the payees was connected to the Venezuelan government and why they received the money. T. 259.

In sum, Askew's circumstantial evidence falls short of mandating a finding that there was an unlawful disclosure by the IRS. While we do take exception to the lower court's methodology in arriving at its findings and conclusions, we have absolutely no quarrel with its result. Accordingly, the judgment is affirmed.

11. *E.g.*, Messer testified that he was never able to trace a $616,000 transfer from CIBC to the Swiss Bank Overseas, Ltd., in Panama City, Panama, because he was told that the bank secrecy laws in Panama prevented disclosure of any information about the account in which the money was deposited. Messer later found out from the Bicameral Commission Report

that the money went through two accounts in the Panamanian Swiss bank before eventually ending up in the National Discount Bank in Caracas. T. 252–53; *see also* T. 289 (Giroux: "[I]t seems to me that ... whoever was doing the investigating [for the Venezuelan government], was getting a lot more information that we could get.").